**THIRD DIVISION**
**MIKELL, P. J.,**
**MILLER and BLACKWELL, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**July 3, 2012**

# In the Court of Appeals of Georgia

A12A0740. KNIGHT et al v. ROBERTS.

A12A0741. CONE v. KNIGHT et al.

A12A0770. THE MEDICAL CENTER, INC. v. KNIGHT et al.

MILLER, Judge.

Arthur F. Knight, Jr., individually and as executor of the estate of Barbara P. Knight (collectively "Knight"), brought the instant medical malpractice action against Dr. Fred T. Roberts, Dr. Terry A. Cone, and The Medical Center, Inc. d/b/a Columbus Regional Medical Center ("TMC"), alleging that the doctors and nursing staff had failed to timely diagnose Mrs. Knight's aortic dissection heart condition, which led to her death. Dr. Roberts, Dr. Cone, and TMC each filed motions for summary judgment, contending that Knight had failed to present evidence that their acts or omissions caused or contributed to Mrs. Knight's death. TMC also filed a motion to

exclude the testimony of Knight's expert nurse, Cathleen A. Provins Chubock, challenging her qualifications as an expert in emergency room nursing procedures.[1] The trial court granted Dr. Roberts's motion for summary judgment, but denied Dr. Cone's and TMC's motions for summary judgment. The trial court further denied TMC's motion to exclude the testimony of Knight's expert nurse.

We granted Dr. Cone's and TMC's applications for interlocutory appeal for review of the trial court's denial of their motions for summary judgment. Knight cross-appeals the trial court's order granting summary judgment for Dr. Roberts. Since these appeals involve the same set of facts and legal principles, we consolidated them for review. We conclude that the evidence presents a genuine issue of material fact as to whether the negligence of Dr. Roberts, Dr. Cone, and the nursing staff proximately caused Mrs. Knight's death; therefore, we reverse the trial court's grant of summary judgment in favor of Dr. Roberts in Case No. A12A0740. We affirm the trial court's decisions denying summary judgment to Dr. Cone and TMC in Case Nos.

---

[1] TMC's motion also sought to exclude the testimony of Knight's expert nurse, Janice L. Singleton Rodgers. The motion noted that Ms. Rodgers died after providing her deposition testimony. The trial court granted TMC's motion to exclude Ms. Rodgers's testimony on the ground that her testimony was not going to be offered into evidence. The exclusion of Ms. Rodgers's testimony is not the subject of these appeals.

A12A0741 and A12A0770. We also affirm the trial court's denial of TMC's motion to exclude the expert nurse's testimony in Case No. A12A0770.

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. A defendant may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case.
>
> When ruling on a motion for summary judgment, the opposing party should be given the benefit of all reasonable doubt, and the court should construe the evidence and all inferences and conclusions therefrom most favorably toward the party opposing the motion. Further, any doubts on the existence of a genuine issue of material fact are resolved against the movant for summary judgment. When this Court reviews the grant or denial of a motion for summary judgment, it conducts a de novo review of the law and the evidence.

(Punctuation and footnotes omitted.) *Beasley v. Northside Hosp., Inc.*, 289 Ga. App. 685, 685-686 (658 SE2d 233) (2008).

So viewed, the record shows that on the afternoon of February 17, 2001, Mrs. Knight was bathing her dog when she suddenly began experiencing a pain in her

3

chest. Later that evening, Mrs. Knight went to TMC's Emergency Department ("ER"), arriving at approximately 8:00 p.m. Mrs. Knight registered into the ER at approximately 8:14 p.m. and saw a nurse for an initial assessment at 8:20 p.m. Mrs. Knight reported that she was 61 years old, had a history of smoking and hypertension, and was then experiencing severe chest pain that radiated down her arm, back, and neck. She stated that her pain level was a "10," which was the highest level. Her blood pressure was elevated to 228/104. The nurse placed Mrs. Knight into the triage category of "urgent," rather than "emergent."

Dr. Roberts was the attending physician in the ER that evening, and he saw Mrs. Knight at 8:35 p.m., approximately 15 minutes after her initial assessment. Dr. Roberts reviewed the nurse's notes describing Mrs. Knight's symptoms and history, and he performed a physical examination. Upon his examination at 8:35 p.m., he ordered a CCU panel, chest x-ray, placement on a monitor, sublingual nitroglycerine, and a GI cocktail. The nurses, however, did not begin to carry out the orders immediately; instead, Mrs. Knight was not placed on a monitor until 9:20 p.m., and her medications were not given until 9:30 p.m., almost an hour later after the orders were given.

4

At 10:25 p.m., the results of the diagnostic testing were entered, and Dr. Roberts noted that Mrs. Knight's vital signs appeared to be normal and that diagnostic testing indicated that her cardiac enzymes were normal, her chest-x-ray was negative, and an EKG did not show any acute ischemic changes. The record shows that although Mrs. Knight's blood pressure had decreased to 154/88, it remained elevated throughout her treatment in the ER. Based upon his examination, Dr. Roberts made a differential diagnosis of angina, myocardial infarction, pleurisy, costochondritis, esophageal reflux, and chest wall pain.[2] He never considered thoracic aneurysm or an aortic dissection.

At approximately 11:45 p.m., Dr. Roberts contacted Dr. Cone, who was providing on-call coverage for Mrs. Knight's family physician, and advised that Mrs. Knight was in the ER. Dr. Cone ordered that Mrs. Knight be admitted to the hospital for further observation and testing. Dr. Cone also ordered that Mrs. Knight be given Lovenox, a blood thinner. Dr. Roberts stated that after treatment, and by his reassessment at 11:45 p.m., Mrs. Knight's symptoms were completely relieved. Notes

---

[2] Dr. Roberts testified that ER physicians generally make a diagnosis by exclusion. He further stated that TMC's ER computer has a template system that generates the differential diagnosis required for insurance billing purposes.

in the medical record, however, indicate that Mrs. Knight had continued to complain of pain symptoms, and that Dr. Roberts gave a verbal order to give her morphine for pain in her back at 12:48 a.m.

On the following day, February 18th at 1:53 p.m., while Mrs. Knight remained hospitalized at TMC, Dr. Cone examined Mrs. Knight and reviewed her hospital chart. Dr. Cone indicated that Mrs. Knight's blood pressure had decreased to 142/76, and that she did not appear to be in distress. Dr. Cone noted that the diagnosis was chest pain and that there was a need to rule out ischemic heart disease. Dr. Cone did not consider a differential diagnosis of aortic dissection. He ordered that Mrs. Knight undergo a stress test, which was scheduled for the next morning.

Mrs. Knight continued to receive morphine for pain and a nitroglycerine drip. She complained that she was feeling weak and had a headache. She was given aspirin and Darvocet to relieve the headache. At approximately 11:00 p.m. on February 18th, the second day of Mrs. Knight's hospital stay, another EKG was performed and a different attending physician diagnosed an acute inferior wall myocardial infarction. Mrs. Knight was immediately transferred to TMC's intensive care unit, and a cardiologist at St. Francis Hospital was consulted. TMC did not have the capability of rendering non-medical treatment or performing heart surgery, and therefore, Mrs.

6

Knight was transferred to St. Francis Hospital for a catheterization at approximately 1:00 a.m. on February 19, 2001.

The catheterization performed on February 19th revealed that Mrs. Knight had an aortic dissection, a tear in the ascending aorta above her heart, which required emergency surgery. She was immediately transferred to Emory Hospital for the emergency surgery at approximately 3:45 a.m. on February 19th.

Mrs. Knight arrived at Emory Hospital on February 19th at approximately 6:00 a.m. and was in the operating room at 7:00 a.m. Dr. Robert A. Guyton, the cardiothoracic surgeon, testified that upon opening Mrs. Knight's chest for the surgery, he observed a large hemorrhage and a hematoma, amounting to excessive bleeding into the tissue around her right coronary artery and in the right ventricle. Dr. Guyton opined that the surgery would have been difficult since she had been given blood thinners at TMC, which increased the risk of bleeding and the risk of mortality. Based upon his observations, the surgeons determined that if they operated on Mrs. Knight, she had less than a 1% chance of surviving the surgery. As such, the surgeons decided not to proceed with the operation.

Thereafter, Mrs. Knight experienced a progressive deterioration of multiple organ systems since the heart was not able to pump enough blood to keep the rest of

the body functioning. Mrs. Knight passed away less than a week later on February 27, 2001.

*Case No. A12A0740*

1. Knight contends that the trial court erred in granting summary judgment in favor of Dr. Roberts on the basis of causation. He argues that evidence shows that Dr. Roberts's negligent misdiagnosis delayed Mrs. Knight's treatment, which precluded immediate surgical intervention and repair and caused her death.

> To recover in a medical malpractice case, a plaintiff must show not only a violation of the applicable medical standard of care but also that the purported violation or deviation from the proper standard of care is the proximate cause of the injury sustained. In other words, a plaintiff must prove that the defendants' negligence was both the cause in fact and the proximate cause of his injury.

(Citations omitted.) *Walker v. Giles*, 276 Ga. App. 632, 638 (624 SE2d 191) (2005). See also *Zwiren v. Thompson*, 276 Ga. 498, 499 (578 SE2d 862) (2003) (three essential elements to establish liability in a medical malpractice action under OCGA § 51-1-27 are "(1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure be the proximate cause of the injury sustained.") (citations omitted).

8

Medical malpractice being a civil cause of action, a plaintiff must prove liability (i.e., duty, negligence, proximate cause) by a preponderance of the evidence. OCGA § 24-4-3. "Preponderance of the evidence" is statutorily defined as "that superior weight of evidence upon the issues involved, which, while not enough to free the mind wholly from a reasonable doubt, is yet sufficient to incline a reasonable and impartial mind to one side of the issue rather than to the other." OCGA § 24-1-1 (5). The standard requires only that the finder of fact be inclined by the evidence toward one side or the other.

(Citation and punctuation omitted.) *Zwiren*, supra, 276 Ga. at 499.

The parties' arguments in this case focus upon the causation element of the medical malpractice claim.

(a) *Cause-In-Fact.* "Medical causation must be proved to a reasonable degree of medical certainty and cannot be based on mere speculation. A bare possibility of causing the injury complained of is not sufficient proof of causation as a matter of law." (Citation and punctuation omitted.) *Walker*, supra, 276 Ga. App. at 638 (1). In a medical misdiagnosis case, the plaintiff must show "to any reasonable degree of medical certainty that the injury could have been avoided, had the physician complied with the applicable standard of care." (Citation and punctuation omitted.) Id. The element of causation must be established through expert testimony

9

because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the average layperson. Using the specialized knowledge and training of his field, the expert's role is to present to the jury a realistic assessment of the likelihood that the defendant's alleged negligence caused the plaintiff's injury.

(Citations and punctuation omitted.) *Zwiren*, supra, 276 Ga. at 500-501. "Georgia case law requires only that an expert state an opinion regarding proximate causation in terms stronger than that of medical possibility, i.e., reasonable medical probability or reasonable medical certainty." Id. at 503. "Questions regarding causation are peculiarly questions for the jury except in clear, plain, palpable and undisputed cases." (Citations and punctuation omitted.) *Walker*, supra, 276 Ga. App. at 639 (1).

Applying the foregoing standards, the expert testimony in this case presented a genuine issue of material fact as to whether Mrs. Knight's death could have been avoided if Dr. Roberts had properly diagnosed her condition in compliance with the applicable standard of care. The expert testimony bearing upon the causation issue in this case was given by Dr. Guyton, a cardiothoracic surgeon who had operated on between 100 and 150 ascending aortic dissections over the course of 30 years; Dr. Phillip L. Coule, who was an assistant professor of emergency medicine at the

10

Medical College of Georgia and a physician with expertise in emergency medicine and prior experience in treating aortic dissections; and Dr. Lawrence L. Golusinski, Jr., who was a family practice physician with prior experience in diagnosing and treating aortic dissections. Each of the experts opined that Mrs. Knight's aortic dissection began to occur in the early afternoon of February 17th when she started having chest pain while she was washing her dog at home. Based upon their testimony, Mrs. Knight's aortic dissection condition existed at the time when she initially presented to the ER.

Dr. Coule and Dr. Golusinski both explained that the typical symptoms of aortic dissection include sudden, continuous chest pain, back pain, and hypertension.[3] They further testified that when Mrs. Knight presented to the ER with those symptoms, along with her history of being a 61-year-old smoker, Dr. Roberts was required to consider and take steps to consider dissection as a diagnosis. Although Dr. Roberts had obtained a chest x-ray as a part of his examination of Mrs. Knight, Dr. Coule and Dr. Golusinski further explained that simply obtaining a chest x-ray was not a diagnostic test that could be used to rule out an aortic dissection since chest

---

[3] Each of the experts testified that dissections are rare. Dr. Guyton and Dr. Golusinski testified that dissections are more common in men.

11

x-rays do not reveal the existence of aortic dissections. The expert physicians also stated that a CT scan was required to be performed to look for and diagnose the presence of an aortic dissection.[4] Dr. Golusinski stated that if a CT scan had been performed immediately, it would have confirmed the existence of a dissection. Dr. Coule and Dr. Golusinski both opined that Dr. Roberts deviated from the standard of care when he failed to consider and obtain a CT scan imaging of the aorta to make the diagnosis of an aortic dissection. Dr. Coule further testified that an emergency physician's duty under the standard of care is to make the diagnosis of an aortic dissection, attempt to stop the dissection from progressing by controlling the blood pressure aggressively, and then to immediately transfer the patient to a facility for emergency surgical intervention. The evidence does not reflect that Dr. Roberts took any of these steps required to comply with the standard of care. Dr. Coule's testimony also reflected that as a result of Dr. Robert's failure to properly diagnose Mrs.

---

[4] Dr. Roberts acknowledged that he could have gotten a CT scan on demand in the ER. He further acknowledged that symptoms of aortic dissection include chest pain that can radiate to the shoulders, back, and arms, along with hypertension. Dr. Roberts nevertheless conceded that he never considered the diagnosis of an aortic dissection or a thoracic aneurysm.

Knight's aortic dissection, the dissection continued to exist and progress over the course of her hospitalization at TMC.

Dr. Coule also testified that the diagnosis of an aortic dissection is a true emergency in which time is of the essence. Dr. Guyton similarly testified that since aortic dissections can either rupture or progress at any time, they must be treated on an emergent basis. The expert testimony indicated that the sooner the diagnosis could have been made and aggressive treatment instituted, the better Mrs. Knight's chances of survival. Significantly, Dr. Guyton opined that if the diagnosis of an aortic dissection had been made timely and Mrs. Knight had been at Emory for the surgery, it could have been successfully repaired any time up until she had her infarction at 11:00 p.m. on February 18th. According to Dr. Guyton, Mrs. Knight's chances of survival prior to the myocardial infarction were likely in the 70% to 80% range, but her chances of survival diminished to 3% or less after the infarction occurred. Dr. Coule testified that the harm that resulted from the deviation of the standard of care was based upon a continuum that extended from Dr. Roberts's failure to timely diagnose and treat Mrs. Knight's aortic dissection in the ER. According to Dr. Coule, the longer that Mrs. Knight remained without appropriate diagnosis and treatment,

the worse her condition progressed and her chances of survival diminished. Dr. Guyton testified that Mrs. Knight's death was the downstream result of the dissection.

Based on this combined expert testimony, we conclude that Knight presented evidence creating a genuine issue of material fact over whether the myocardial infarction, reflecting the rupture of Mrs. Knight's aortic dissection, would have been prevented if Dr. Roberts had properly complied with the standard of care during Mrs. Knight's examination in the ER. See *Naik v. Booker*, 303 Ga. App. 282, 286-287 (692 SE2d 855) (2010) (affirming the denial of summary judgment to a physician who had failed to timely identify and stop the patient's hemorrhage, which contributed to the patient's ultimate death); *MCG Health v. Barton*, 285 Ga. App. 577, 583-584 (2), (3) (647 SE2d 81) (2007) (affirming the denial of the Board of Regent's motion for summary judgment since a jury question regarding causation existed based upon expert testimony that the physician's delay in diagnosing the patient's torsion condition prevented emergency surgery to salvage the patient's testicle); *Walker*, supra, 276 Ga. App. at 641-642 (1) (concluding that a jury issue as to causation was presented in the patient's medical malpractice action based upon combined expert testimony that the rupture of the patient's appendix could have been avoided if she had not been misdiagnosed upon her first admission into the hospital). Since there

was expert testimony reflecting that Dr. Robert's misdiagnosis contributed to Mrs. Knight's death, the trial court erred in granting summary judgment in Dr. Roberts's favor.

Dr. Roberts nevertheless argues that there was no expert testimony suggesting that Mrs. Knight required immediate surgical intervention after he evaluated her. His argument, however, is without merit. As stated above, Dr. Guyton, the cardiothoracic surgeon, testified that since aortic dissections can either rupture or progress at any time, they must be treated on an emergent basis. Dr. Coule testified that Dr. Roberts had a duty to make the diagnosis and immediate transfer to a facility for emergency surgical intervention. Notably, Dr. Roberts himself acknowledged that "[t]he quicker that the thoracic surgeon [gets] . . . the patient with an aortic dissection, the better." To the extent that the delay caused by Dr. Roberts's misdiagnosis contributed to the delay in Mrs. Knight's ability to receive timely treatment and surgical intervention, a jury question as to the element of causation existed. See *MCG Health*, supra, 285 Ga. App. at 583-584 (3) (jury question regarding causation existed where the delayed diagnosis led to the loss of the patient's testicle; the fact that the medical expert could not identify the exact point in time in which the condition became unsalvageable did

15

not render the testimony speculative); see also *Walker*, supra, 276 Ga. App. at 641-642 (1).

To the extent that Dr. Roberts points to conflicting evidence that Mrs. Knight appeared to have been stabilized after he evaluated her such that emergency surgery may not have been performed,[5] the evidentiary conflicts did not authorize summary adjudication in his favor. "Causation may be established by linking the testimony of several different experts. Furthermore, whether or not a genuine issue of fact has been created with regard to causation must be determined in light of the evidentiary record as whole." (Citations omitted.) *Walker*, supra, 276 Ga. App. at 642 (1). Based upon the evidentiary record in this case, a genuine question of fact as to the cause-in-fact element existed and summary judgment was precluded.

(b) *Proximate Cause.* "The requirement of proximate cause constitutes a limit on legal liability; it is a policy decision that, for a variety of reasons, e.g., intervening act, the defendant's conduct and the plaintiff's injury are too remote for the law to countenance recovery." (Citation omitted.) *Walker*, supra, 276 Ga. App. at 643 (2).

_____

[5] While Dr. Roberts asserts that Mrs. Knight was stable when he treated her and released her to Dr. Cone for further care, there was evidence contradicting his assertion. Notably, there was evidence that Mrs. Knight remained hypertensive, albeit at a lower level. The evidence also reflected that Mrs. Knight had continued to complain of pain symptoms and continued to receive morphine for pain.

It is well settled that there can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent, intervening, act of someone other than the defendant, which was not foreseeable by defendant, was not triggered by defendant's acts, and which was sufficient of itself to cause the injury. However, it is equally well settled that proximate cause is generally an issue for the jury, and *there may be more than one proximate cause of an injury in cases involving the concurrent negligence of several actors*.

(Citations and punctuation omitted; emphasis supplied.) *MCG Health*, supra, 285 Ga. App. at 584-585 (3); *Walker*, supra, 276 Ga. App. at 643 (2). "[P]revious Georgia cases permitting joint and several liability of two or more physicians who independently treat a patient at different times but together cause an indivisible injury to the plaintiff implicitly reject the notion that a first-treating physician is absolved of legal responsibility as a matter of law." (Citations and punctuation omitted.) *Walker*, supra, 276 Ga. App. at 644 (2). Moreover, "the liability of a tortfeasor whose actions started the chain of events leading to the victim's injury is superseded and cut off only if there intervened between the act and the injury a distinct, successive, unrelated, efficient cause of the injury." (Citation, punctuation, and emphasis omitted.) Id.

17

Here, Knight's medical expert, Dr. Coule, testified that the longer that Mrs. Knight remained without appropriate diagnosis and treatment, the worse her condition progressed and her chances of survival diminished. Dr. Coule concluded that Dr. Roberts's failure to timely diagnose Mrs. Knight's aortic dissection in the ER was a contributing cause leading to Mrs. Knight's ultimate death and amounted to a link in the continuum that culminated in her death. Dr. Roberts's argument that he turned Mrs. Knight's care over to Dr. Cone and was not involved in Dr. Cone's evaluation and treatment is unavailing. Here, Dr. Cone's alleged misdiagnosis and mistreatment of Mrs. Knight during her ongoing hospitalization at TMC was not unrelated to Dr. Roberts's previous alleged failure to properly diagnose and treat Mrs. Knight. In light of evidence that Dr. Roberts's negligence was "a link in the chain of incorrect decisions made with regard to [Mrs. Knight's] treatment[,]" a jury question of proximate cause existed. See *MCG Health*, supra, 285 Ga. App. at 585 (3); *Walker*, supra, 276 Ga. App. at 644-645 (2); see also *Schriever v. Maddox*, 259 Ga. App. 558, 561 (2) (b) (578 SE2d 210) (2003) (concluding that the subsequent treating physician's alleged negligence were not intervening, but were very similar to the initial physician's negligence, and therefore, merely compounded the initial

18

physician's negligence). It thus follows that the trial court erred in granting summary judgment in Dr. Roberts's favor.

*Case No. A12A0741*

2. Dr. Cone contends that the trial court erred in denying his motion for summary judgment. Specifically, he argues that there was no evidence that his acts or omissions proximately caused or contributed to Mrs. Knight's death.

Significantly, Knight's medical malpractice claim against Dr. Cone is substantially the same as his claim against Dr. Roberts. Knight's claim alleges that Dr. Cone likewise misdiagnosed and mistreated Mrs. Knight's aortic dissection condition when she was under his care. The evidence shows that Dr. Cone had consulted with Dr. Roberts while Mrs. Knight was in the ER, he was aware of her symptoms, and that he reviewed her hospitalization chart and examined her on the afternoon of February 18th. Notably, the evidence further reflects that Dr. Cone also failed to obtain a CT scan and to diagnose Mrs. Knight's aortic dissection. There was evidence that under Dr. Cone's care, Mrs. Knight's condition continued to exist and progress to the point of a myocardial infarction at 11:00 p.m. on February 18th.

19

As discussed in Division 1 above with respect to the claims and evidence against Dr. Roberts, the evidence likewise showed that Dr. Cone deviated from the standard of care when he failed to take the necessary steps to confirm the existence of Mrs. Knight's aortic dissection. The evidence further showed that Dr. Cone's misdiagnosis delayed the necessary surgical intervention and contributed to Mrs. Knight's demise. See *MCG Health*, supra, 285 Ga. App. at 583-584 (3); *Walker*, supra, 276 Ga. App. at 641-642 (1). Based upon the same standards and principles set forth in Division 1 above, summary judgment in favor of Dr. Cone was not authorized. The trial court therefore did not err in denying Dr. Cone's motion.

*Case No. A12A0770*

3. TMC challenges the trial court's denial of its motion for summary judgment, contending that there was no evidence that the nurses' alleged negligence caused or contributed to Mrs. Knight's death. Again, we discern no error.

Knight alleged that the nurses negligently failed to triage Mrs. Knight in the emergent patient status, which contributed to the delay in her treatment and her death.[6] Knight's experts, Dr. Coule and nurse Cathleen Provins Churbock, both

_____

[6] We note that "[t]he practice of nursing is recognized as a profession subject to its own general standards of care and qualifications. OCGA §§ 9-11-9.1 (g) (12); 43-26-1 et seq. (registered nurses)[.]" (Citation and punctuation omitted.) *Grady Gen.*

20

attested that Mrs. Knight's symptoms and condition required her to be triaged under the status of emergent pursuant to the standard of care, and that the emergency room nurses' decision to instead designate her as urgent was erroneous. Nurse Churbock further stated that as a result of the mistriage, Mrs. Knight was not given the immediate attention and treatment that was required. Mrs. Knight's hospital records reflected that the nurses did not immediately carry out Dr. Roberts's orders for Mrs. Knight's medications and treatment until almost an hour after the orders were given. Dr. Coule testified that the required medications and treatment would have controlled Mrs. Knight's blood pressure and the flow of blood going between the sections of her aorta.[7] He attested that the delay in the administration of the medication contributed

*Hosp. v. King*, 288 Ga. App. 101, 102 (653 SE2d 367) (2007). TMC was alleged to be liable for the acts of negligence of its employee nurses under the doctrine of respondeat superior. See, e.g., *Thomas v. Medical Ctr. of Central Ga.*, 286 Ga. App. 147, 148 (648 SE2d 409) (2007) (ruling that a hospital's vicarious liability was entirely derivative of the nurses' alleged professional malpractice).

[7] TMC challenges Dr. Coule's opinion based upon its contention that Mrs. Knight was not hypertensive and had a reasonable blood pressure when she was in the ER. TMC's contention is without merit. There was evidence establishing that Mrs. Knight was indeed hypertensive when she arrived at the ER, having a blood pressure of 228/104, and that she remained hypertensive throughout the time that she was in the ER.

21

to Mrs. Knight's ultimate death.[8] Dr. Coule's opinion, as stated above, was that the harm resulting from the deviation from the standard of care was based upon a continuum. Similar to the physicians' negligent delay, the nurses' negligent delay and failure to intervene contributed to the worsening of Mrs. Knight's condition and ultimate death. As such, summary adjudication of Knight's claims in this regard was precluded. See, e.g., *Renz v. Northside Hosp.*, 285 Ga. App. 882, 883-886 (1) (648 SE2d 186) (2007); *MCG Health*, supra, 285 Ga. App. at 583-584 (3); *Walker*, supra, 276 Ga. App. at 641-642 (1). Simply, the legal analysis set forth in Division 1 above applies equally to the ER nurses.

---

[8] We note that there appears to be an unexplained conflict in Dr. Coule's deposition testimony regarding whether the delay in administering the nitroglycerine contributed to Mrs. Knight's death. At one point, Dr. Coule testified that he could not say that Mrs. Knight would not have died if she had received the nitroglycerine earlier in her treatment. He further opined, however, that the delay in administering the medication worsened Mrs. Knight's condition and allowed the dissection to progress. Significantly, Dr. Coule also testified that the delay in administering the nitroglycerine had contributed to Mrs. Knight's ultimate death. Notwithstanding the apparent conflict, however, "the self-contradictory testimony rule of *Prophecy Corp. v. Charles Rossignol, Inc.*, [256 Ga. 27 (343 SE2d 680) (1986)], does not apply to the testimony of a non-party expert witness." (Punctuation omitted.) *Thompson v. Ezor*, 272 Ga. 849, 853 (2) (536 SE2d 749) (2000). The trial court properly concluded that Dr. Coule's testimony that the delay in administering the nitroglycerine had contributed to Mrs. Knight's death supported Knight's claims and created a jury question on the proximate causation issue.

Nurse Churbock further testified that TMC deviated from the standard of care by allowing a student nurse to assist in Mrs. Knight's care. TMC argues that the trial court erred in finding that a question of fact existed as to whether allowing the student nurse to participate in Mrs. Knight's care was a deviation from the standard of care, and in failing to find that such act did not proximately cause Mrs. Knight's death. To the extent that the student nurse was not sufficiently supervised, which contributed to the delayed treatment, as discussed above, we discern no error in the trial court's decision denying summary judgment on this issue.

4. Lastly, TMC contends that the trial court erred in finding that Nurse Churbock was qualified to serve as an expert under OCGA § 24-9-67.1 when the statements of her affidavit regarding her qualifications conflicted with her deposition testimony. Again, no error has been shown.

OCGA § 24-9-67.1 (b) provides, in pertinent part that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact in any cause of action to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise[.]" Subsection (c) of the statute further pertinently provides as follows:

[I]n professional malpractice actions, the opinions of an expert, who is otherwise qualified as to the acceptable standard of conduct of the professional whose conduct is at issue, shall be admissible only if, at the time the act or omission is alleged to have occurred, such expert:

(1) Was licensed by an appropriate regulatory agency to practice his or her profession in the state in which such expert was practicing or teaching in the profession at such time; and

(2) In the case of a medical malpractice action, had actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given as the result of having been regularly engaged in:

(A) The active practice of such area of specialty of his or her profession for at least three of the last five years, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in performing the procedure, diagnosing the condition, or rendering the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue; or

(B) The teaching of his or her profession for at least three of the last five years as an employed member of the faculty of an educational institution accredited in the teaching of such profession, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in teaching others how to perform the procedure, diagnose the condition, or render the treatment which is alleged to have been

24

performed or rendered negligently by the defendant whose conduct is at issue; and

 (C) . . . (i) Is a member of the same profession[.]

(Punctuation omitted.)

Nurse Churbock submitted a curriculum vitae that set forth her nursing education, licensure in Georgia, and work experience. Nurse Churbock also gave deposition testimony reflecting she was currently employed as an acute care nurse practitioner with WellStar Hospital in Cardiovascular Medicine in the ER and ICU departments. Immediately prior thereto, she had worked for seven years with Grady Health System as a critical care clinical nurse specialist, director of nursing for the burn unit, director of nursing for the surgical ICU, and education coordinator for the critical care program. Since 1990, she has taught critical care and ER nurses on a part-time basis. She previously worked full-time in the ICU at Emory, and worked as a PRN as a bedside nurse. She stated that she last performed clinical work as a bedside registered nurse in December 2009, seven months prior to her deposition. Nurse Churbock further testified that although she had not diagnosed or treated a dissection within the five years preceding 2001, she had been involved in taking care of patients who had dissections.

25

Following her deposition, Nurse Churbock submitted an affidavit, which further attested that she had relevant work experience in a hospital emergency room within the five year period prior to the incident on February 17, 2001. The affidavit reflected that from 1996 to 1997, she worked at two local hospitals in the ICU and emergency room departments. From 1997 through 2001, Nurse Churbock had worked full-time in various local hospital emergency rooms, triaged patients in emergency rooms to determine their status, taught emergency room nurses, and maintained her Georgia nursing license and national emergency room nursing certifications Nurse Churbock concluded that based upon her experience and training, she was familiar with the standard of care required of emergency room nurses at the time of the incident.

While Nurse Churbock's deposition testimony generally described her nursing experience, her affidavit supplemented the testimony with greater detail as to the dates of her experience. The full evidence reflected that Nurse Churbock had actual professional knowledge and experience in the relevant areas of nursing as a result of having been regularly engaged in the active practice of critical care and ER nursing for three of the five years preceding February 2001. The trial court was therefore authorized to conclude that she was qualified to serve as an expert in this case. See,

e.g., *Allen v. Family Medical Center*, 287 Ga. App. 522, 525-526 (2) (652 SE2d 173) (2007).

> The issue of the admissibility or exclusion of expert testimony rests in the broad discretion of the court, and consequently, the trial court's ruling thereon cannot be reversed absent an abuse of discretion. Under *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U. S. 579 (113 SC 2786, 125 LE2d 469) (1993)], disputes as to an expert's credentials are properly explored through cross-examination at trial and go to the weight and credibility of the testimony, not its admissibility. Accordingly, we find no abuse of discretion.

(Citation omitted.) *Gottschalk v. Gottschalk*, 311 Ga. App. 304, 310 (2) (715 SE2d 715) (2011).

*Judgment reversed in Case No. A12A0740; judgments affirmed in Case Nos. A12A0741 and A12A0770. Mikell, P. J., and Blackwell, J., concur.*