**SECOND DIVISION
MILLER, P. J.,
HODGES and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**June 16, 2021**

# In the Court of Appeals of Georgia

A21A0256. EVANS et al. v. THE MEDICAL CENTER OF CENTRAL GEORGIA.

MILLER, Presiding Judge.

Brandy Evans, individually and as the administrator of the estate of Ralph Moss (collectively "Evans"), appeals from the trial court's order granting summary judgment on her claims for medical malpractice against nurse Briana Stelmachers and the Medical Center of Central Georgia ("MCCG"). Evans argues that the trial court erred in granting summary judgment because the evidence presented a fact issue as to whether the defendants' negligence proximately caused Moss's death. We agree and therefore reverse the trial court's judgment.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. In reviewing a grant or denial of summary judgment, we owe no deference

to the trial court's ruling and we review de novo both the evidence and the trial court's legal conclusions. Moreover, we construe the evidence and all inferences and conclusions arising therefrom most favorably toward the party opposing the motion. In doing so, we bear in mind that the party opposing summary judgment is not required to produce evidence demanding judgment for it, but is only required to present evidence that raises a genuine issue of material fact.

(Citations and punctuation omitted.) *Swint v. Alphonse*, 348 Ga. App. 199, 199-200 (820 SE2d 312) (2018). "To defeat a motion for summary judgment the respondent does not have to present conclusive proof to rebut the movant's evidence; if the respondent produces or points to any specific evidence, *even slight*, in the record giving rise to a triable issue of material fact, then summary judgment must be denied." (Citation and punctuation omitted; Emphasis supplied.) *Peach Blossom Dev. Co. v. Lowe Elec. Supply Co.*, 300 Ga. App. 268, 269 (684 S.E.2d 398) (2009).

So viewed, the record shows that on July 26, 2014, 57-year-old Ralph Moss was transported by ambulance to MCCG's Emergency Department after he complained of vomiting and chest pain that radiated to his left arm. Moss arrived at the Emergency Department at 12:28 p.m., and he was not experiencing chest pain at that time. Briana Stelmachers, a nurse in the Emergency Department, assessed Moss

and, based on standing orders, performed an electrocardiagram ("ECG")[1] and troponin level blood test. Moss's ECG was initially read as "Borderline ECG - Preliminary - MD Must Review STAT," and emergency room physician Dr. Nathan Stokes subsequently interpreted the ECG as showing "no ischemic changes."[2] A troponin test was performed at 1:24 p.m., and it revealed that Moss's troponin level was elevated at 0.09ng/mL, above the normal range of 0-0.08ng/mL.

To assure that each patient presenting to the emergency department with chest pain receives the proper diagnosis and that heart attack core measures are addressed, MCCG's internal policy requires a physician, nurse practitioner, or physician assistant to assign patients to one of four order set tracks. Nurses are to follow orders on the assigned track, so if a patient has not been assigned a track, the policy provides that the nurse should ask the physician for track orders. Tracks 1–3 are for patients with chest pain of certain or probable cardiac origin and require, among other things, serial ECGs and serial troponin testing. Track 4 is for patients with chest pain of probable non-cardiac origin and does not require serial testing. Stelmachers initially

_____

[1] Throughout the record, witnesses refer to the electrocardiogram test as both ECG and EKG. We refer to the test as ECG in this opinion.

[2] A cardiologist who reviewed the ECG the same day interpreted it as "Borderline," with "significant ECG contour changes and T abnormalities."

3

triaged Moss as "Level III," but Dr. Stokes did not assign Moss to a track, and Stelmachers did not approach Dr. Stokes about placing Moss on one.

Dr. Stokes evaluated Moss at 1:50 p.m. Moss told Dr. Stokes that he had recently undergone a stress test and the results were negative. Based on Moss's physical exam and history, Dr. Stokes documented several risk factors for heart attack, including a history of high cholesterol and COPD and a family history of coronary artery disease, hypertension, and diabetes. Moss told Dr. Stokes that he had no nausea or vomiting. Although Moss had complained of those symptoms to EMS and Nurse Stelmachers, Dr. Stokes could not recall whether he saw the report documenting Moss's complaints of those symptoms before he decided to discharge Moss.

Moss was discharged from the Emergency Department at 2:42 p.m, having received a single ECG and single troponin test. Dr. Stokes entered the discharge instructions and Stelmachers went over them with Moss. The discharge paperwork advised Moss that, based on his exam, the exact cause of his chest pain was unknown but his condition did not appear to be serious and the pain did not appear to be coming from his heart. Moss died the next day, at his home, of an acute myocardial infarction.

4

Moss's widow brought the instant medical malpractice action against Drs. Stokes and Kalambur Panchapakesan, Nurse Stelmachers, and MCCG, alleging that they failed to follow proper protocols when Moss visited the Emergency Department with chest pain, which led to Moss being prematurely discharged and caused his death. Mrs. Moss voluntarily dismissed her claims against Dr. Panchapakesan. After Mrs. Moss died during litigation, the Mosses' daughter, Evans, was substituted as the plaintiff. Evans reached a settlement with Dr. Stokes, leaving only the claims regarding Nurse Stelmachers pending.

Nurse Stelmachers and MCCG moved for summary judgment, and the trial court granted their motion, concluding that any alleged negligence by Stelmachers was not the proximate cause of Moss's premature discharge because there was undisputed evidence that Dr. Stokes would have discharged Moss even if Stelmachers had questioned his decision. This appeal followed.

In her sole enumeration of error, Evans argues that the trial court erred when it granted summary judgment to MCCG because the totality of the evidence surrounding Moss's discharge created a fact issue as to whether Stelmachers's alleged negligence proximately caused Moss's death. We agree.

To recover in a medical malpractice case, a plaintiff must show not only a violation of the applicable medical standard of care but also that the purported violation or deviation from the proper standard of care is the proximate cause of the injury sustained. In other words, a plaintiff must prove that the defendants' negligence was both the cause in fact and the proximate cause of his injury.

(Citation omitted.) *Knight v. Roberts*, 316 Ga. App. 599, 603 (1) (730 SE2d 78) (2012).

Causation in a medical malpractice action must be established through expert testimony because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the average layperson. But Georgia case law requires only that an expert state an opinion regarding proximate causation in terms stronger than that of medical possibility, i.e., reasonable medical probability or reasonable medical certainty. And causation may be established by linking the testimony of several different experts and must be determined in light of the evidentiary record as a whole. Furthermore, it is well established that questions regarding causation are peculiarly questions for the jury except in clear, plain, palpable and undisputed cases.

(Punctuation and citations omitted). *Central Ga. Women's Health Center, LLC v. Dean*, 342 Ga. App. 127, 134 (1) (b) (800 S.E.2d 594) (2017). See also *Moore v. Singh*, 326 Ga. App. 805, 809 (1) (755 SE2d 319) (2014) (same).

6

In his deposition, Dr. Stokes testified that he decided to discharge Moss because Moss was asymptomatic while at the hospital, had recently had a negative stress test, had an unremarkable ECG, and had unremarkable vital signs while at the hospital. Although Moss's troponin level was slightly elevated, Dr. Stokes considered that to be clinically unremarkable. As to the order tracks, Dr. Stokes stated that, in practice, initiating a formal track is optional; physicians use or omit components from various tracks as they see fit. If Dr. Stokes would have assigned Moss to a formal track, it would have been Track 4 for probable non-cardiac origin chest pain, which, as noted above, does not require subsequent ECGs or troponin testing. Dr. Stokes stated that if Stelmachers had approached him and questioned his decision to discharge Moss, he still would have discharged Moss unless Stelmachers shared some additional information with him. He further stated that, even knowing everything in the record, he was not aware of any facts that should have raised a concern prior to discharge.

Evans presented expert witness testimony from September Lee Evans, R. N., who testified that, based on Moss's history and complaints when he arrived at the Emergency Department, Stelmachers should have triaged him as the more urgent

7

Level II rather than Level III. According to Nurse Evans, Stelmachers further breached the standard of care by failing to complete the required triage form, and Nurse Evans explained that a completed form reflecting all of Moss's symptoms might have caused Dr. Stokes to order serial ECG or troponin tests. In addition, Stelmachers failed to advocate for Dr. Stokes to place Moss on a formal track order, or at least to conduct more testing such as a serial ECG and serial troponin test, and this lack of advocacy was a breach of the standard of care in light of Moss's borderline ECG and elevated troponin level. Nurse Evans noted that if Dr. Stokes was not receptive, a nurse can go up the chain of command to advocate for her patient. She also noted that although Stelmachers was aware that Moss had complained of vomiting, Dr. Stokes apparently was not aware of that symptom. Thus, Nurse Evans concluded that Nurse Stelmachers's breaches of the standard of care, "to a reasonable degree of medical certainty, caused and/or contributed to Mr. Moss experiencing an unmonitored and untreated deterioration in his condition, a delay in medical care and treatment, and an out of hospital cardiac arrest which caused and contributed to Mr. Moss'[s] death."

Another expert witness, Dr. Robert Attaran, M. D. testified that, in his medical opinion, Moss's premature discharge "almost certainly led to his death." He testified

8

that the signs and symptoms of acute coronary syndrome include chest discomfort and nausea. He also testified that "[a]n acute troponin elevation is myocardial infarction until proven otherwise." As Dr. Attaran explained, one test alone would not give a definitive answer as to whether a patient's high troponin level is part of a worrisome upward trend, so troponin levels should be measured every few hours to determine if they are trending upward. Dr. Attaran noted that although the ultimate decision to discharge a patient is made by the physician, there are "checks and balances in the protocol to ensure that the physician doesn't miss something[.]" Those protocols include various track order sets to treat patients who present with chest pain, and the track set system was not followed in this case. Dr. Attaran opined that, if Stelmachers had expressed concern about Moss's elevated troponin level and risk factors, Dr. Stokes might have reconsidered his decision to discharge Moss.

We conclude from this record that there is a genuine fact issue as to whether Nurse Stelmachers's actions were a proximate cause of Moss's death. We first note that, in this case, Evans presented expert testimony that Moss's premature discharge "almost certainly led to his death." And although it was Dr. Stokes who made the decision to discharge Moss, that does not absolve Nurse Stelmachers from liability. See, e.g., *Knight v. Roberts*, 316 Ga. App. 599, 609 (1) (b) (730 S.E.2d 78) (2012)

9

("In light of evidence that [the first doctor]'s negligence was 'a link in the chain of incorrect decisions made with regard to [the plaintiff's] treatment[,]' a jury question of proximate cause existed.").

Evans's expert witnesses testified that Stelmachers's breaches in the applicable standard of care – including her failure to ensure a track order set had been assigned by the doctor, failure to communicate with Dr. Stokes about Moss's elevated troponin level, failure to advocate for additional testing, and failure to complete the required triage form – caused or contributed to Moss's premature discharge. In her affidavit, Nurse Evans clarified that she believed, "to a reasonable degree of medical certainty," that Nurse Stelmachers's breaches of the standard of care caused or contributed to Moss's premature discharge.[3] Also, Dr. Attaran testified that hospital protocol

---

[3] The appellees contend that Nurse Evans was not qualified to testify as to causation in this case because that issue falls within the purview of a medical doctor. But the issue here concerns the identification of signs and symptoms rather than a medical diagnosis, and whether Stelmachers's failure to identify Moss's signs and symptoms and communicate them to Dr. Stokes led to Moss's premature discharge. See *Freeman v. LTC Healthcare of Statesboro, Inc.*, 329 Ga. App. 763, 766 (766 SE2d 123) (2014) ("Georgia law does not mandate that only medical doctors be permitted to testify regarding medical issues; others with certain training and experience may testify on issues within the parameters of their expertise. . . This rule extends to a licensed registered nurse testifying as an expert within the areas of her expertise.") (citations and punctuation omitted). Here, Dr. Attaran testified that Moss's premature discharge led to his death, and Nurse Evans, a former emergency room nurse and clinical nurse team leader, testified that Stelmachers's breaches in the

10

includes "checks and balances" to make sure that the physician does not miss anything, and he and Nurse Evans testified that Moss may not have been discharged if Nurse Stelmachers had called attention to his elevated troponin level or other risk factors. There was also evidence that, even if Dr. Stokes had not been receptive to Stelmachers's advocacy, she could have reached out to a charge nurse or other physician. This testimony creates a question for the jury as to whether Nurse Stelmachers's breaches in the standard of care were a proximate cause of Moss's premature discharge, which led to his death. See *Central Ga. Women's Health Center, LLC*, supra, 342 Ga. App. at 134 (1) (b) (question of proximate cause is for the jury except in "clear, plain, palpable and undisputed cases"); *Moore*, 326 Ga. App. at 809 (1) (same); *Peach Blossom Dev. Co.*, supra, 300 Ga. App. at 269 (summary judgment is improper if opposing party produces even slight evidence giving rise to a triable issue of material fact).

MCCG's reliance on our decisions in *Swint v. Mae*, 340 Ga. App. 480 (798 SE2d 23) (2017) and *Reeves v. Mahathre*, 328 Ga. App. 546 (759 SE2d 926) (2014) (physical precedent only), is misplaced because those cases are distinguishable. In

nursing standard of care, including her failure to identify Moss's symptoms, contributed to that premature discharge. Thus, we conclude that Nurse Evans's testimony falls within the scope of her expertise.

11

*Swint*, the patient's shoulder was injured while he was undergoing a prostatectomy. *Swint*, supra, 340 Ga. App. at 481. During the surgery, he was in a Trendelenburg position with his arms tucked to his sides. Id. at 481. The expert witnesses testified that they were uncertain what led to the patient's injury; it could have resulted either from the initial positioning, the length of the surgery, or both. Id. at 482. The expert witnesses also acknowledged that, prior to the patient's surgery in 2010, there was no medical literature or statistical data advocating that a patient undergoing this type of surgery be repositioned simply because of the length of the surgery. Id. at 483. Thus, it was not clear whether the patient's initial positioning or the lack of repositioning caused his injury and therefore, even if the defendants had prevented the lack of repositioning, the patient still may have been injured. Id. at 484 (1). Here, however, there is evidence in the record establishing that it was the premature discharge that caused Moss's injury. And, as discussed above, there was evidence that Stelmachers's breaches in the standard of care contributed to that premature discharge.

In *Reeves*, a patient went to the emergency room with complaints of nausea and severe pain in her abdomen and right flank. *Reeves*, supra, 328 Ga. App. at 547. The emergency room physician discharged the patient with instructions to follow up with her primary-care physician. Id. The next morning, a CT scan revealed that the patient

12

had a kidney stone. Id. The patient ultimately died of sepsis, and, in the resulting wrongful-death lawsuit, the plaintiffs argued that the emergency room doctor was liable for medical malpractice for failing to order a CT scan or diagnose the kidney stone before discharging the patient. Id. at 548. But the evidence showed that if the doctor had diagnosed the patient with a kidney stone, he would have consulted with a urologist. Id. at 549. And the urologist who ultimately treated the patient testified that if the emergency room doctor had consulted him, he would have advised the doctor to do exactly what he did: send the patient home to see if she would pass the stone independently. Id. at 549-550. In addition, a causation expert testified that the patient had no obvious signs of a urinary infection when she went to the emergency room, and he stated that he had no opinion on whether the emergency room doctor caused or contributed to the patient's death. Id. at 550. In light of this evidence, we concluded that the defendants were entitled to summary judgment due to a lack of evidence as to causation. Id. at 550-551.

Here, unlike in *Reeves*, there is evidence suggesting that the patient warranted care his treating physician did not provide to him. Experts testified that Moss should have been placed on the Level II track order and that his troponin levels should have been monitored over several hours before he was discharged. Further, a cardiologist

13

who reviewed Moss's ECG testified that it had significant abnormalities, in contrast to Dr. Stokes's interpretation of the test as unremarkable. To the extent Nurse Stelmachers failed to perform actions – such as calling Dr. Stokes's attention to Moss's troubling symptoms, including his nausea and vomiting, or advocating for Moss to be placed on a treatment order track – that would have made it more likely for Moss to be provided with the care that was warranted, this situation is distinguishable from that in *Reeves*, where the missed diagnosis would have triggered a consult with a urologist but would not have resulted in any change in the patient's treatment. Consequently, we do not find *Reeves* to be controlling, and, for the reasons stated above, we conclude that genuine issues of material fact remain as to whether Stelmachers's negligence proximately caused Moss's death and that the trial court therefore erred by granting summary judgment.

Accordingly, we reverse the trial court's grant of summary judgment to MCCG and Stelmachers.

*Judgment reversed. Hodges and Pipkin, JJ., concur.*