## A11A1696. LADNER v. NORTHSIDE HOSPITAL, INC.
### (723 SE2d 450)

ELLINGTON, Chief Judge.

In this medical malpractice case, Barbara Ladner, individually and as executrix of her deceased husband's estate, appeals from the trial court's grant of summary judgment to Northside Hospital, Inc. Ladner contends that the trial court erred in granting summary judgment based upon its ruling that she had failed to offer expert witness testimony on the specialized medical question of whether the hospital's allegedly negligent credentialing of her husband's surgeon to perform prostatic cryosurgery was the proximate cause of her husband's postoperative complications and death. As explained below, it is unnecessary for this Court to reach the issue of whether Ladner was required to present expert witness testimony to show causation, however, because the undisputed evidence shows that the surgeon did not perform the cryosurgery negligently. Consequently, Ladner has failed to show that there is a jury question on the issue of whether the hospital's alleged negligent credentialing caused her husband's postoperative complications and death, and we affirm the trial court's grant of summary judgment.

> In order to prevail on a motion for summary judgment under OCGA § 9-11-56, the moving party must show that there exists no genuine issue of material fact, and that the undisputed facts, viewed in the light most favorable to the nonmoving party, demand judgment as a matter of law.

(Citation omitted.) *Benton v. Benton*, 280 Ga. 468, 470 (629 SE2d 204) (2006). Under OCGA § 9-11-56 (e), when a party moves for summary judgment and supports the motion by submitting affidavits, depositions, or answers to interrogatories, the opposing party

> may not rest upon the mere allegations or denials of his [or her] pleading, but his [or her] response, by affidavits or as otherwise provided in this Code section, must set forth specific facts showing that there is a genuine issue for trial. If he [or she] does not so respond, summary judgment, if appropriate, shall be entered against him [or her].

Further, "[a]lthough the nonmoving party on a motion for summary judgment is entitled to the benefit of all reasonable inferences to be drawn from the evidence, such inferences cannot be based on mere conjecture or possibility or upon evidence which is too uncertain or speculative." (Citation and punctuation omitted.) *Whiteside v. Decker, Hallman, Barber & Briggs*, 310 Ga. App. 16, 19 (712 SE2d

87) (2011). Ultimately,

> on appeal from the denial or grant of summary judgment[,] the appellate court is to conduct a de novo review of the evidence to determine whether there exists a genuine issue of material fact, and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.

(Citations omitted.) *Benton v. Benton*, 280 Ga. at 470. So viewed, the record shows the following facts.

Dr. Vahan Kassabian is a board-certified urologist who has been employed by Georgia Urology, P.A., since 1994, the same year he began practicing at Northside Hospital. In May 2001, the hospital added prostatic cryosurgery to his list of privileges, and he performed eight such procedures prior to May 2002. On May 9, 2002, Dr. Kassabian performed prostatic cryosurgery on Ladner's husband, Clyde Ladner, at the hospital to treat Mr. Ladner's prostate cancer. No significant or unusual complications were observed during or immediately after surgery, and Mr. Ladner was released from the hospital the next day. During follow-up visits with Mr. Ladner on May 17 and June 7, Dr. Kassabian recorded that Mr. Ladner was experiencing bleeding, bruising, constipation, and discomfort, which are common postsurgical complications of prostatic cryosurgery; in addition, during the latter visit, Mr. Ladner exhibited symptoms of a bladder infection and was prescribed antibiotics.

Then, on June 12, five weeks after the cryosurgery, Mr. Ladner started experiencing problems with voiding his bladder and had blood clots in his urine. Dr. Kassabian provided some treatment and performed tests in his office the next day, and Mr. Ladner went home. That night, however, Mr. Ladner went to the hospital's emergency room and was hospitalized due to unusual and excessive bleeding and abnormal results from blood tests. Over the next two weeks, Mr. Ladner's condition worsened, and he required additional treatment and surgeries, including the removal of part of his intestines and colon. At some point during such treatment, it was determined that Mr. Ladner had sustained a rectal injury during the May 9 prostatic cryosurgery. Mr. Ladner remained hospitalized for three months (hereinafter, the "hospitalization") and, despite treatment for the rectal injury and the other complications, he died on September 22, 2002.

Ladner sued Dr. Kassabian and his employer, Georgia Urology,[1]

---

[1] Ladner's complaint also asserted a medical malpractice claim against another physician who treated Mr. Ladner during the hospitalization. That claim is not at issue in this appeal.

alleging that Dr. Kassabian negligently performed the prostatic cryosurgery, that he breached the applicable standard of care by failing to timely diagnose and treat her husband's postoperative complications, and that such negligence caused her husband's injuries and death.[2] The complaint also named the hospital as a defendant[3] and alleged that it had negligently credentialed Dr. Kassabian to independently perform prostatic cryosurgery by failing to fully comply with its bylaws, its rules and regulations, and other applicable standards for the credentialing process.[4]

The hospital answered and filed a motion for summary judgment, arguing, inter alia, that there was no evidence that its credentialing of Dr. Kassabian to perform prostatic cryosurgery — regardless whether such credentialing failed to comply with applicable standards — was the proximate cause of the postoperative complications Mr. Ladner experienced during his hospitalization or his eventual death.

Following a hearing on the hospital's motion, the trial court ruled that, even if it were to assume that the hospital was negligent in credentialing Dr. Kassabian to perform the prostatic cryosurgery, the issue of whether such negligent credentialing was the proximate cause of Mr. Ladner's postoperative complications and death constituted a specialized medical question for which Ladner was required to come forward with expert witness testimony, citing *Cowart v. Widener*, 287 Ga. 622 (697 SE2d 779) (2010).[5] The trial court also determined that

---

[2] According to Ladner's appellate brief, the

gravamen of the medical negligence claim against Dr. Kassabian [is] negligent postoperative management; more specifically, negligent failure to timely diagnose the cause of and effectively treat the postoperative hematuria and a rectal injury, resulting in a cascade of other complications . . . and causing the untimely death of Mr. Ladner.

[3] The complaint did not assert a claim that the hospital was vicariously liable for Dr. Kassabian's negligence or that it had negligently supervised him. Further, Ladner later withdrew a medical malpractice claim against the hospital based upon negligence allegedly committed by its nursing staff.

[4] "[A] hospital has a direct and independent responsibility to its patients to take reasonable steps to ensure that staff physicians using hospital facilities are qualified for privileges granted." (Punctuation and footnote omitted.) *McCall v. Henry Med. Center*, 250 Ga. App. 679, 681 (1) (551 SE2d 739) (2001). See also *Madonna v. Satilla Health Svcs.*, 290 Ga. App. 148, 151 (658 SE2d 858) (2008) (A hospital has a duty to follow its bylaws when granting privileges.). It follows that a cause of action for negligent credentialing of staff physicians and other medical care providers is an independent cause of action that arises out of that responsibility. *Wellstar Health Systems v. Green*, 258 Ga. App. 86, 88 (1) (572 SE2d 731) (2002).

[5] [E]ven in simple negligence cases, plaintiffs must come forward with expert evidence to survive a defense motion for summary judgment, where "medical questions" relating to causation are involved. . . . [T]he term "medical question" has been used to describe situations where the existence of a causal link between the defendant's conduct and the plaintiff's injury cannot be determined from common knowledge and experience and instead requires the assistance of experts with specialized medical knowledge. . . . [I]n deciding whether [a] plaintiff is

Ladner had not come forward with such evidence and, therefore, granted the hospital's motion for summary judgment.[6]

On appeal from that order, Ladner contends that the trial court erred in ruling that she was required to present expert witness testimony on the issue of proximate causation. She argues that the issue of whether the hospital's negligent credentialing of Dr. Kassabian to perform prostatic cryosurgery was the proximate cause of her husband's postoperative complications and death is the sort of medical question that lay jurors are qualified to answer using their experience and common knowledge.[7] According to Ladner, it follows that the trial court erred in granting the hospital's motion for summary judgment.

As explained below, however, it is unnecessary for this Court to decide whether the trial court erred in ruling that Ladner was required to present expert witness testimony to show that the alleged gaps in the credentialing process were the proximate cause of her husband's postoperative complications and death, because Ladner presented no evidence of *any* kind from which a jury could find such causation.[8] Thus, pretermitting whether the trial court's conclusion was correct as to the need for expert witness testimony in this case, we conclude that its judgment granting the hospital's motion for summary judgment was proper.[9]

"[I]t is a well settled principle of negligence law that the

---

required to come forward with expert testimony to withstand a defense motion for summary judgment, the critical question is not whether the causation element involves a "medical question" in the generic sense of the term. Rather, it is whether, in order to decide that the defendant's conduct proximately caused the plaintiff's injury, a lay jury would have to know the answers to one or more "medical questions" that, as the case law has defined that term, can be answered accurately only by witnesses with specialized expert knowledge. To make the term more clearly reflect its use in deciding cases, we will now refer to "specialized medical questions."

Id. at 627-629 (2) (a), (b).

[6] The trial court designated the order as a final judgment in favor of the hospital, pursuant to OCGA § 9-11-54 (b). Ladner's medical malpractice claims remain pending against Dr. Kassabian and the other named defendants.

[7] See *Cowart v. Widener*, 287 Ga. at 626-628 (2) (a), (b) (Generally, "there is no requirement that expert testimony must be produced by a plaintiff to a negligence action in order to prevail at trial. . . . [This is because] most 'medical questions' relating to causation are perfectly capable of resolution by ordinary people using their common knowledge and experience, without the need for expert testimony. . . . [Thus, where] the causal link between the defendant's conduct and the decedent's injury can be determined by a lay jury without expert guidance, no expert evidence need be produced to defeat a defense motion for summary judgment.") (citations and punctuation omitted).

[8] This conclusion also applies to and resolves Ladner's related argument that, even if the trial court was correct in ruling that she was required to provide expert witness testimony on the issue of proximate causation, it erred in finding that she had failed to do so.

[9] This Court must affirm a judgment that is right for any reason. *Craigo v. Azizi*, 301 Ga. App. 181, 187 (3) (687 SE2d 198) (2009).

occurrence of an unfortunate event is not sufficient to authorize an inference of negligence." (Citation, punctuation and footnote omitted.) *Hardnett v. Silvey*, 285 Ga. App. 424, 426 (646 SE2d 514) (2007). Further,

> [b]efore any negligence, even if proven, can be actionable, that negligence must be the proximate cause of the injuries sued upon. To establish proximate cause, a plaintiff must show a legally attributable causal connection between the defendant's conduct and the alleged injury. The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to grant summary judgment for the defendant.

(Citations and punctuation omitted.) *Grinold v. Farist*, 284 Ga. App. 120, 121-122 (1) (643 SE2d 253) (2007). See *Hardnett v. Silvey*, 285 Ga. App. at 426 ("On the issue of the fact of causation, as on other issues essential to the cause of action for negligence, the plaintiff, in general, has the burden of proof.") (citation, punctuation and footnote omitted).

The record shows that Ladner presented the deposition testimony of two expert witnesses: Dr. John Hyde, an expert in the area of hospital credentialing of medical personnel, and Dr. Jeffrey Cohen, who testified about the standard of care for performing prostatic cryosurgery and treating complications resulting therefrom, as well as his opinions on the issue of Dr. Kassabian's alleged negligence in treating Mr. Ladner.

According to Dr. Hyde, the hospital failed to fully comply with the applicable minimum standards[10] when credentialing Dr. Kassabian to independently perform prostatic cryosurgery. For example, Dr. Hyde testified that, in his opinion, the hospital failed to require Dr. Kassabian to perform enough "proctored" surgeries (with the assistance, and/or under the supervision, of an experienced and properly credentialed surgeon) to ensure that he was sufficiently competent to independently perform the cryosurgery before authorizing him to do so. Dr. Hyde emphasized, however, that his criticism of the hospital *extended only to its credentialing to perform the cryosurgery* and did

---

[10] Dr. Hyde specifically testified that he had no criticism of the substance or integrity of the hospital's medical staff bylaws and other rules that regulated its credentialing process.

not apply to the hospital's general grant of privileges to Dr. Kassabian that allowed him to admit patients and to perform other procedures. Moreover, it is undisputed that Dr. Hyde is not a physician and had never observed a complete cryosurgery of the prostate at the time of his deposition. Consequently, he had no opinion as to Dr. Kassabian's clinical competence or on the issue of whether the physician violated the standard of care when performing Mr. Ladner's cryosurgery or while providing postoperative care. *In fact, he specifically testified that he was not implying that there was any causal connection between the hospital's negligent credentialing of Dr. Kassabian for the prostatic cryosurgery and Mr. Ladner's death.*[11]

As for Dr. Cohen, he testified that, in his opinion, prostatic cryosurgery was an appropriate treatment for Mr. Ladner's prostate cancer, and *Dr. Kassabian did not violate the standard of care when performing the cryosurgery.*[12] According to Dr. Cohen, the injury to Mr. Ladner's rectum that resulted from the cryosurgery is a recognized complication of the surgery and *was not the result of any negligence on Dr. Kassabian's part.* In fact, Dr. Cohen testified that *any* prostate surgery, not just cryosurgery, could result in a complication such as a rectal injury. In addition, Dr. Cohen testified that he had no criticism of the hospital's care of Mr. Ladner during his cryosurgery or his overnight hospitalization at that time. Dr. Cohen also found no negligence on the part of Dr. Kassabian during the follow-up visits with Mr. Ladner on May 17 and June 7 in the physician's office, testifying that, at that time, the symptoms that Mr. Ladner was experiencing gave no reason for Dr. Kassabian to suspect that a rectal injury had occurred during the cryosurgery.

Dr. Cohen opined, however, that Dr. Kassabian[13] *was* negligent when he failed to promptly diagnose and treat Mr. Ladner's rectal injury after he was hospitalized on June 13, five weeks after the cryosurgery. According to Dr. Cohen, given Mr. Ladner's symptoms on June 13, Dr. Kassabian should have conducted a CT scan, a rectal exam, a cystoscopy, a sigmoidoscopy, and other tests as necessary to discover the source of the symptoms within 48 hours of the patient's admission. If such tests had been conducted in a timely manner, Dr.

---

[11] Notably, on a separate issue regarding the equipment used during Mr. Ladner's cryosurgery, Dr. Hyde testified as follows: "I'm not going to go into medical causation. I'm not a clinician, I'm not a physician or form of clinician, so I'm not going to make a medical causation opinion or render one at all."

[12] Dr. Cohen testified that he was never asked to form an opinion or comment on whether Dr. Kassabian had sufficient training and experience to perform the procedure.

[13] Although Dr. Cohen also commented on the treatment provided by other physicians during Mr. Ladner's hospitalization, only Dr. Kassabian's treatment, and the hospital's responsibility therefor pursuant to its credentialing of Dr. Kassabian to perform cryosurgery, is at issue in this case.

Kassabian would have discovered the rectal injury and would have been able to immediately begin appropriate treatment. In Dr. Cohen's opinion, if Mr. Ladner had been properly diagnosed and treated in a timely manner, "he probably would have survived." Dr. Cohen concluded, therefore, that *it was the unnecessary delay in the diagnosis and treatment of the rectal injury during the hospitalization that began on June 13 — not the rectal injury itself — that was the proximate cause of Mr. Ladner's postoperative complications and ultimate death.*

Thus, even if the hospital failed to follow the requisite procedures when credentialing Dr. Kassabian to perform prostatic cryosurgery, there is no evidence that Dr. Kassabian performed Mr. Ladner's cryosurgery negligently. It follows that, absent any proof of Dr. Kassabian's negligence during the cryosurgery, Ladner is unable to establish any causal connection between the credentialing and Mr. Ladner's postoperative complications and death.

Ladner contends, however, that a jury issue remains as to the hospital's negligent credentialing simply because the rectal injury that eventually resulted in her husband's postoperative complications and death *occurred* during the May 9, 2002 cryosurgery, *regardless* whether that rectal injury was caused by Dr. Kassabian's negligence during the cryosurgery or was an unfortunate, but recognized, complication of a properly performed procedure. Ladner relies primarily on the January 2004 affidavit of Dr. Gerald Gowitt, offered pursuant to OCGA § 9-11-9.1, who was the medical examiner who conducted the autopsy on Mr. Ladner and who concluded that his death was the result of "multiple sequelae[14] of the prostatic cryosurgery performed by Dr. Kassabian on May 9, 2002."[15] However, pretermitting whether Dr. Gowitt was qualified to give an expert

---

[14] "Sequelae" is defined as a "condition following as a consequence of a disease." Stedman's Medical Dictionary, 27th ed., p. 1622 (2000). See also Merriam-Webster.com (defining "sequelae" as "an aftereffect of disease, condition, or injury" or "a secondary result").

[15] Notably, in contrast to this conclusory statement in his affidavit, Dr. Gowitt's statements in his April 2003 autopsy report demonstrate that his opinion of the exact cause of Mr. Ladner's death was far less certain.

> This 75-year-old white male underwent cryotherapy for prostatic cancer in May, 2002. Complications of blood clot retention within the urinary bladder developed and were treated with Foley catheter irrigations. He was admitted to Northside Hospital on June 14th. [Dr. Gowitt then summarized the numerous complications Mr. Ladner experienced and treatments he received during that hospitalization, noting that,] [u]nfortunately, the diagnostic and/or therapeutic events of May and June, 2002, *had been so obscured* by the over three-month interval until death that *a satisfactory reconstruction [of what transpired] could not be accomplished.* It is [my] opinion . . . that the performance of cryosurgery resulted in bleeding, which *probably* led to ischemic bowel necessitating colostomy. *Probably because of his age and underlying natural diseases such as diabetes, cardiac fibrosis, and high blood pressure[,] [Mr. Ladner] did not tolerate the surgery well and developed a number of serious and physically stressful postoperative complications.* Further complicating

opinion on whether Dr. Kassabian *negligently performed* the cryo-surgery or whether Mr. Ladner's postoperative complications and death were *caused by such negligence*, he offered no such opinion.

Moreover, as shown above, Dr. Cohen, Ladner's own expert witness, affirmatively stated that the rectal injury was *not* the result of Dr. Kassabian's negligence during the cryosurgery, but was a complication that could have occurred during *any* prostate cancer surgery and in the absence of any negligence, and that Dr. Kassabian's negligence did not occur until five weeks later, during his treatment of Mr. Ladner following the June 13 emergency hospitalization. Ladner has failed to present any evidence — expert or otherwise — that the hospital erred in credentialing Dr. Kassabian to provide such postsurgical treatment. In fact, Ladner's credentialing expert, Dr. Hyde, specifically testified that he was not criticizing the hospital's grant of general privileges to Dr. Kassabian to perform *any* procedure other than the cryosurgery.

Accordingly, given the absence of any evidence from which a jury could reasonably conclude that the hospital's allegedly negligent credentialing of Dr. Kassabian to perform prostatic cryosurgery was the proximate cause of Mr. Ladner's postoperative complications and death, the trial court did not err in granting summary judgment to the hospital.

*Judgment affirmed. Phipps, P. J., and Doyle, P. J., concur.*

DECIDED FEBRUARY 16, 2012.

*Steel & Moss, John D. Steel, Orr & Edwards, James G. Edwards II, Susan M. Cremer*, for appellant.

*Allen, McCain & O'Mahoney, Hunter S. Allen, Jr., Scrudder, Bass, Quillian, Horlock, Taylor & Lazarus, Henry E. Scrudder, Jr., R. Keith Whitesides, Tawana B. Johnson*, for appellee.

---

his course was additional surgery in late August, which once again placed severe stress on his overall body systems, which ultimately [led] to multiple organ system failure and his death.

(Emphasis supplied.)