**FOURTH DIVISION**
**DOYLE, P. J.,**
**MCFADDEN and BOGGS, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 18, 2014**

# In the Court of Appeals of Georgia

A13A2387. MOORE et al. v. SINGH et al.                    DO-120

DOYLE, Presiding Judge.

This appeal arises from the grant of a motion for directed verdict in favor of Sonu G. Singh, M. D., and Peach State Nephrology, Inc., in a medical malpractice action filed by Herbert Moore, individually and as the administrator of the Estate of Rosemary Moore. For the reasons that follow, we reverse.

A directed verdict is authorized only when there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict. A grant of directed verdict is a ruling that the evidence and all reasonable deductions therefrom demand a particular verdict. It is illogical to say such a finding will be upheld if there is any evidence to support it. A grant of directed verdict can be upheld only where we determine that all the evidence demands that verdict. This requires a de novo review. . . . It is correct to say that a directed verdict cannot be

granted if there is any evidence to support a contrary verdict, but there cannot be "some evidence" that all the evidence demands a particular verdict.[1]

Viewed in this light, the evidence presented at trial showed that on December 23, 2008, after a fall in her home during which she hit her left knee on a door frame, Rosemary Moore, who as a result of her diabetes had end-stage renal disease, was transported by ambulance to Henry Medical Center Emergency Department ("Henry Medical"). Rosemary complained that she was unable to put weight on her leg, and she feared that her ankle was sprained; she also had a contusion on her knee, which was x-rayed, but did not appear to have a fracture per the radiologist's report. Rosemary was diagnosed with a left ankle sprain and left knee contusion and discharged from the hospital that same day, but Rosemary was not able to stand or walk at that time.

---

[1] (Citations and punctuation omitted.) *Carden v. Bruckhalter*, 214 Ga. App. 487, 488-489 (1) (b) (448 SE2d 251) (1994) ("It was said [in] *Ga. Dept. of Human Resources v. Montgomery*, 248 Ga. 465, 466 (284 SE2d 263) that in Georgia, the standard used to review the grant or denial of a directed verdict is the any evidence test; however, this was used to explain substantial evidence and it was dictum. Also, the case cited for the proposition, *Speir v. Williams*, 146 Ga. App. 880 (247 SE2d 549), never made it. A rule that the standard for review of the grant of directed verdict is the any evidence test is often . . . quoted in dictum") (punctuation and citations omitted.). See also OCGA § 9-11-50 (a).

The following morning, December 24, 2008, Moore found Rosemary unresponsive in their bed, and she was again transported to Henry Medical, where Dr. Singh, who is a nephrologist who treats patients with diabetes, treated her until she was discharged on January 5, 2009.[2] Rosemary regained consciousness on December 26, and she again complained of pain in her left leg. Over the course of the hospital stay, Rosemary was assessed for various other ailments related to her diabetes, and a physical therapist assessed her left leg, finding that her pain in that leg was centered on her knee and tibial tuberosity,[3] but Dr. Singh did not follow up on the physical therapist's findings and did not order further x-rays, a CT scan, an MRI, or consult with an orthopedist regarding the issue.

Rosemary continued to experience issues with her leg and was unable to bear weight on it. She regularly saw doctors for the other ailments she experienced as a result of her diabetes, but in late February 2009, she sought assistance from Dr. Brice

---

[2] Dr. Singh was on vacation from December 31 to January 5 during the later portion of her hospitalization, however, she was the treating physician and discharge physician for Rosemary's hospitalization during the period.

[3] The top area of the tibia, apparent just under the kneecap.

3

Choi about her leg.[4] Dr. Choi determined that Rosemary had sustained a fracture in her tibia that had at some point displaced[5] and healed in the displaced position, and he referred her to orthopedist Dr. Daniel Orcutt for treatment. On April 2, 2009, Dr. Orcutt performed surgery on Rosemary's leg, which surgery included breaking the partially healed bone in order to set it with pins for healing in the correct position.

At trial, Dr. Stephan Borkan provided expert testimony that a nephrologist examining Rosemary would have been concentrating on the status of her bones, which could be affected by end-stage renal disease and the length of time she had been on dialysis, circulatory problems, and peripheral neuropathy, which is the decreased perception of pain and normal stimuli in the extremities. Borkan testified that doctors are taught specifically to describe and localize particular portions of the lower extremities to which they are referring when assessing a patient and describing

---

[4] The defendants contend that Rosemary was seeking assistance about her *right* leg, but there is a question of fact as to this issue, which could have been a transcription error. In any event, during his treatment of Rosemary, Dr. Choi uncovered the existence of the healed fracture, and thus, the defendant's argument that Rosemary was seeking assistance for right leg pain as opposed to left leg pain has no bearing on the issue of Dr. Singh's potential liability for failure to diagnose the break in late December 2008.

[5] A displaced fracture is one in which the pieces of bone are no longer correctly aligned in relation to each other.

symptoms in a chart. He explained that the upper leg is the area below the pelvis and above but not including the knee, the knee is the knee joint, the lower leg is the area below but not including the knee to the ankle joint, and below the ankle joint is the foot.

Dr. Borkan testified that Dr. Singh's December 27 notes failed to meet the standard of care by adequately describing and localizing Rosemary's pain to a specific portion of Rosemary's left leg, instead, noting that she had "severe pain in the [left] leg" and contained a notation that the "[left] leg is tender [and] swelling." Dr. Borkan further testified that Dr. Singh should have explained to a more precise degree where on the leg the pain and swelling was, the appearance of that particular portion of the leg — swelling, tenderness, bruising — Rosemary's ambulation ability, and the failure to so specify was a breach of the standard of care.

Dr. Borkan testified that there was evidence Dr. Singh was examining the leg because she noted deep vein thrombosis and cellulitus as possible issues causing the leg pain, but contrary to the standard of care, Dr. Singh failed to note the area of the leg where the symptoms appeared that may indicate such issues. Dr. Borkan explained that a chart should be able to stand alone so that any other medical providers could step in and easily assess what the other doctor had found with regard

5

to symptoms and what other possibilities had been ruled out; Borkan stated that he had "not seen such a superficial and inadequate record in" his career, and the damage that it can lead to is misdiagnosis. Dr. Borkan testified that by December 27, with Rosemary still complaining of pain in her left leg, trauma leaving a contusion and swelling at the knee merely four days prior to that, and redness and pain in the leg as evidenced by the differential diagnosis's inclusion of deep vein thrombosis and cellulitus, Dr. Singh's differential diagnosis also should have included a fracture as a possible diagnosis, and she should have ordered a CT scan, an MRI, or an orthopedic consult.

By December 29, Rosemary still was experiencing pain in her leg and could not bear weight on it, and Dr. Singh ordered a physical therapy consult, which consult localized the pain in Rosemary's leg to the top of the tibial tuberosity and kneecap area; Dr. Singh, however, failed to follow up on that report with any further investigative tests, such as a CT scan, an MRI, or an orthopedic consult between that time and Rosemary's discharge on January 5, 2009, which Dr. Borkan testified was a breach of the standard of care for an attending nephrologist.

Dr. Orcutt testified that when he first saw Rosemary in late March 2009, the fracture was at the least six weeks old, which he estimated based on the appearance

6

of the fracture and the partial healing that had occurred, and he postulated that it had not existed for more than a year. According to Dr. Orcutt, testified that because Rosemary did not have issues walking prior to her December 23 injury, it was unlikely that the fracture existed prior to the incident and was most likely not displaced until sometime after December 23 because the x-ray performed on that day did not show the existence of a fracture, which could have been occult, i.e., not visible on an x-ray, at that point. Dr. Orcutt stated that without some other trauma than that which reportedly occurred on December 23, "[t]he only explanation [for the displaced and re-healed fracture] was [Rosemary] had a nondisplaced fracture after the fall in December that was not diagnosed."

Dr. Orcutt testified that although the fracture could have been an occult fracture on December 23, it could have been detected at that point using a CT scan or MRI scan. Dr. Orcutt testified that if the fracture had been detected while it was non-displaced, then it could have been treated without surgical intervention, which treatment would have included orders not to bear weight and the use of a brace.

At the close of Moore's case, the Defendants moved for a directed verdict, which the trial court granted. In its order granting the motion for directed verdict, the trial court found that

[a]fter considering the testimony presented by Plaintiffs, the Court finds Plaintiff failed to present adequate testimony from a qualified expert any violation of the standard of care on the part of the Defendants proximately caused the injuries for which Plaintiffs w[ere] seeking recovery. Specifically, Plaintiffs presented neither testimony to a reasonable degree of medical probability any violation of the standard of care caused injury to Rosemary Moore, nor did they present testimony to a reasonable degree of medical probability Ms. Moore's injuries for which Plaintiffs were seeking damages at trial could have been avoided.

1. Moore argues that the trial court erred by granting a directed verdict on the basis that he failed to present evidence of causation of any damage to Rosemary. Specifically, Moore contends that he presented evidence of damages, and the trial court erroneously limited its view of damages as the necessity of surgery, and its grant of the directed verdict on this basis is therefore erroneous.

> To recover in a medical malpractice case, a plaintiff must show not only a violation of the applicable medical standard of care but also that the purported violation or deviation from the proper standard of care is the proximate cause of the injury sustained. In other words, a plaintiff must prove that the defendants' negligence was both the cause in fact and the proximate cause of his injury.[6]

---

[6] (Punctuation omitted.) *Knight v. Roberts*, 316 Ga. App. 599, 603 (1) (730 SE2d 78) (2012), quoting *Walker v. Giles*, 276 Ga. App. 632, 638 (624 SE2d 191)

In some instances where the question of causation is outside the ken of the normal juror, this showing must be based on expert testimony that is sufficient to support a finding that the deviation from the standard of care to a reasonable degree of medical certainty caused the injury.[7] "Causation may be established by linking the testimony of several different experts."[8] "Questions regarding causation are peculiarly questions for the jury except in clear, plain, palpable and undisputed cases."[9] Although "[a] plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough . . . ."[10]

Based on the combined expert testimony, we conclude that Moore presented evidence creating a jury issue as to whether Dr. Singh would have discovered the fracture if she had properly complied with the standard of care during the examination

---

(2005).

[7] See *Knight*, 316 Ga. App. at 604 (1) (a); *Ladner v. Northside Hosp., Inc.*, 314 Ga. App. 136, 136-137 (723 SE2d 450) (2012); *Walker*, 276 Ga. App. at 638 (1).

[8] *Knight*, 316 Ga. App. at 607 (1) (a).

[9] Id. at 604 (1) (a).

[10] (Punctuation omitted.) *Ladner*, 314 Ga. App. at 140, quoting *Grinold v. Farist*, 284 Ga. App. 120, 121-122 (1) (643 SE2d 253) (2007).

of Rosemary during her hospitalization, and moreover, whether the failure to diagnose the fracture during that time led to further complications with the break such that surgery was required or made more complicated as a result of approximately two months of lack of treatment.[11]

To the extent that the Defendants contend that Rosemary was not complaining about pain in her leg that would trigger Dr. Singh to assess it for a fracture, there is ample testimony from Moore that Dr. Singh had been made aware of Rosemary's leg pain. Moreover, Dr. Borkan's testimony that Dr. Singh's notes included a differential diagnosis for left leg pain and swelling including deep vein thrombosis and cellulitus, neither of which would manifest in the ankle, support Moore's testimony that Dr. Singh was aware of the pain in the area of the fracture. In conjunction with Dr. Orcutt's testimony regarding the timing of the break, we conclude that material issues of fact exist as to whether Dr. Singh's breach of the standard of care during Rosemary's December 24 to January 5 hospitalization resulted in a failure to diagnose the fracture prior to its displacement or prior to its healing out of position.[12] To the

---

[11] See, e.g., *Knight*, 316 Ga. App. at 606 (1) (a); *Walker*, 276 Ga. App. at 642 (1).

[12] We recognize that Rosemary had a number of conditions during her stay at the hospital and that Dr. Singh was dealing with all of these issues simultaneously,

extent that there are questions regarding these issues, those were for the jury to decide and did not demand the grant of the Defendants' motion for new trial.[13]

Dr. Orcutt testified that he believed Rosemary fractured her leg during her fall on December 23 and that it displaced sometime later based on the fact that the x-ray from that day did not show a fracture. His failure to state that he believed this to be the case "to a reasonable degree of medical certainty" does not require a finding that Moore failed to present evidence of causation — Moore's "experts were not required to use these magic words in rendering their opinions."[14]

Based on the testimony outlined above it was possible for the jury to link the testimony of all the witnesses to find that Dr. Singh's breach of the standard of care resulted in a missed diagnosis of a nondisplaced fracture of Rosemary's left knee,

---

but this does not change the fact that testimony at trial stated that Dr. Singh breached the standard of care with regard to Rosemary's left leg.

[13] See *Walker*, 276 Ga. App. at 642 (1).

[14] Id. at 639 (1) n. 7. "'[R]easonable degree of medical certainty,' while an acceptable means by which an expert may express the confidence the expert has in the conclusion formed and the probability that it is accurate, is not the *required* standard. Georgia case law requires only that an expert state an opinion regarding . . . causation in terms stronger than that of medical possibility, i.e., reasonable medical probability or reasonable medical certainty." (Emphasis in original.) *Zwiren v. Thompson*, 276 Ga. 498, 503 (578 SE2d 862) (2003).

11

which later displaced requiring surgery.[15] The jury also could have found that while surgery could have been required in any event, the failure to diagnose resulted in approximately two months of lack of treatment and a more complicated surgery or recovery period.

Accordingly, the trial court erred by granting the motion for directed verdict.[16]

2. Next, Moore argues that the trial court erred by excluding the following testimony of Dr. Orcutt:[17]

> QUESTION: Can you tell me in terms of probabilities how probable it might be for a nondisplaced fracture to develop into a displaced fracture in a patient like [Rosemary], assuming that the fracture is diagnosed and you place them on nonweight-bearing restriction?
>
> [ORCUTT]: I'm not sure I can give you a probability of that.
>
> QUESTION: Do you think its 50-50? . . . .

---

[15] See, e.g., *Knight*, 316 Ga. App. at 606-607 (1) (a); *Walker*, 276 Ga. App. at 642 (1).

[16] See *Walker*, 276 Ga. App. at 648 (2); *Knight v. West Paces Ferry Hosp., Inc.*, 262 Ga. App. 220, 223 (585 SE2d 104) (2003) ("Before the trial court can direct a verdict for the movant, he must find from the evidence that there is *no evidence* of *any kind* supporting the nonmovant's position.") (emphasis in original).

[17] Because this issue is likely to recur on retrial, we address this enumeration of error.

[ORCUTT]: I would say 20 percent, 30 percent, something like that, likely that it would displace.

QUESTION: So 20 to 30 percent of the patients who have comorbid conditions like [Rosemary] had, even when they're placed on nonweight-bearing restriction, 20 to 30 percent of those patients who have nondisplaced fractures can develop into displaced fractures; correct?

[ORCUTT]: That would be my best estimate.

Moore also argues that the trial court erred by allowing testimony from Dr. Orcutt:

QUESTION: In [Rosemary's] case, can you say that it is more likely than not that even if she had . . . a nondisplaced fracture that was being treated conservatively, that ultimately she would have progressed to a displaced fracture?

[ORCUTT]: I cannot say that. . . .

QUESTION: You can't say one way or the other; is that correct?

[ORCUTT]: That's correct.

The trial court excluded Dr. Orcutt's testimony that approximately 20 to 30 percent of patients like Rosemary who presented with a nondisplaced fracture and were treated with a brace and instructions not to bear weight on the leg would

eventually need surgery because their fractures would displace. The trial court determined that the testimony was speculative; but Dr. Orcutt, although he was "unsure" he could provide a response at first, was able to do so without hesitation after the Defendants' provided an example of the type of response they were asking for.[18] Because the trial court allowed the later testimony by Dr. Orcutt on the same matter, it abused its discretion by disallowing the testimony as to percentages. "[C]ontradictions go solely to the expert's credibility, and are to be assessed by the jury when weighing the expert's testimony."[19] Accordingly, the trial court erred by excluding the testimony.

*Judgment reversed. McFadden and Boggs, JJ., concur.*

---

[18] This is so even in spite of the fact that Moore objected based on speculation at the deposition.

[19] (Punctuation omitted.) *Naik v. Booker*, 303 Ga. App. 282, 286 (692 SE2d 855) (2010), quoting *Thompson v. Ezor*, 272 Ga. 849, 853 (536 SE2d 749) (2000).

14