**FIRST DIVISION
BARNES, P. J.,
RICKMAN and LAND, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**October 23, 2023**

# In the Court of Appeals of Georgia

A23A1014.  SAMPSON et al. v. THE MEDICAL CENTER, INC. et al.

LAND, Judge.

T'Dawn Sampson, individually and as parent and next friend of her minor child, filed this medical malpractice lawsuit alleging that The Medical Center, Inc., April Hartman, M. D., and Emily Cooley, R.N. ("defendants") negligently failed to inform her of the dangers of co-sleeping with her newborn son. She argues that this failure to warn led to her co-sleeping with her child, which caused serious injury and permanent disability to the child. The trial court granted summary judgment to defendants, finding that "the only evidence" Sampson provided that her child's injuries were caused by co-sleeping was the "speculative testimony from her expert witnesses." Sampson appeals, arguing that the trial court erred by ruling that her

experts' opinion testimony was purely speculative. For the following reasons, we reverse.[1]

"To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law." (Citation and punctuation omitted.) *Swint v. Mae*, 340 Ga. App. 480, 480 (798 SE2d 23) (2017). A movant may do this by pointing to "documents, affidavits, depositions and other evidence in the record [to] reveal that there is no evidence sufficient to create a jury issue on at least one essential element of the plaintiff's case." (Citation and punctuation omitted.) Id. at 480-481. To defeat such a motion, the respondent "does not have to present conclusive proof to rebut the movant's evidence [because] if the respondent produces or points to any specific evidence, *even slight*, in the record giving rise to a triable issue of material fact, then summary judgment must be denied." (Citation and punctuation omitted; emphasis in original.) *Evans v. Med. Ctr. of Central Ga.*, 359 Ga. App. 797, 797-798 (860 SE2d

[1] The only issue on this appeal is the trial court's grant of summary judgment based on its conclusion that the expert testimony on causation presented by Sampson is speculative and hence inadmissible. Any issue concerning the scope of the defendants' duty to Sampson and/or her child or any alleged breach of such duty is not before us.

2

100) (2021). This Court reviews the grant or denial of a motion for summary judgment de novo. *Beasley v. Northside Hosp., Inc.*, 289 Ga. App. 685, 686 (658 SE2d 233) (2008).

So viewed, the record shows that Ashton Crowder was born at 38 weeks of gestation via an uncomplicated vaginal delivery at Columbia Regional Health Midtown Medical Center on September 9, 2016. Ashton is the youngest of Sampson's four children. Although the defendants recognized and documented Sampson's knowledge deficits regarding the care of her newborn, there is evidence in the record that they failed to comply with the hospital's protocol to educate new parents about newborn safety, particularly warning against co-sleeping, and failed to provide Sampson with a bassinet and other baby equipment that would normally have been given to her as a Medicaid recipient.

Sampson brought Ashton home from the hospital on September 11, 2016. Once home, Sampson co-slept with Ashton in her king size bed, positioning the infant lying flat and moving blankets and pillows away from his body. She testified that she co-slept with Ashton because she did not have a crib or bassinet for him. Sampson noticed that Ashton often made odd grunting noises while sleeping and that he was exhibiting signs of reflux following feedings. Despite this, Sampson failed to follow

3

her discharge instructions to attend a well-baby appointment with a pediatrician within three days of discharge from the hospital and did not otherwise see a medical provider to address the issue.

Sampson testified that she fell asleep next to Ashton in bed on September 17, 2016. She was later awakened by Ashton making "awkward noise[s]" signifying that he was struggling to breathe. When she picked Ashton up, he was cold, slumped over and his eyes were rolled in the back of his head. Sampson testified that she did not remember waking up and being on top of the infant and she did not believe it was possible that she had rolled over on top of him because there was "space between" their bodies in the bed. She further did not notice anything, such as a blanket or a pillow, obstructing his airway.

Sampson took Ashton to the Midtown Medical Center emergency department. The emergency provider, Dr. Andrew Waldman, wrote in Ashton's medical record that he was "sleeping in the bed with [Sampson] and when she woke up to check on him, he was not responding appropriately and was having difficulty breathing." Dr. Waldman also wrote that Sampson "report[ed] that [the] patient was lying on his back in her bed and state[d] that she did not roll on top of him." Ashton's arterial blood gases showed "significant acidosis," consistent with asphyxia. He did not appear to

have trauma or injury to his head or bones. His lungs were clear and his cardiothymic silhouette was normal.

Ashton was then transferred via Air-Vac to Children's Healthcare of Atlanta Pediatric Intensive Care Unit ("CHOA"). While at CHOA, he was diagnosed with hypoxic-ischemic encephalopathy ("HIE") and other issues, including congenital laryngomalacia, anemia, acute respiratory failure with hypoxemia, coagulopathy, acute kidney failure, convulsions, seizures, hemorragic disease, intercranial hemorrhages, transitory hyperammonemia, melena, glysosuria, hepatomegaly, esophageal reflux metabolic acidosis, and acute renal insufficiency. Ashton's physicians at CHOA were unable to determine the cause of his injuries. As a result of his hypoxic-ischemic brain injury, Ashton suffers from cerebral palsy and developmental delays.

Sampson filed this medical malpractice lawsuit against MMC, Dr. Hartman and Nurse Cooley—Ashton's pediatrician and nurse at the time he was discharged from the hospital after birth— alleging that these providers failed to instruct her about infant sleep safety and the dangers of co-sleeping with an infant and that, as a result of this failure, she co-slept with her infant and that co-sleeping was the proximate cause of Ashton's injuries.

5

In support of her contentions on the issue of causation, Sampson presented expert testimony from Dr. Thomas Heygi and Dr. Steven Shore. Dr. Hegyi, a neonatologist, testified that he had specialized training in Sudden Infant Death Syndrome ("SIDS"). Dr. Hegyi testified that he reviewed Ashton's medical records and that it was his opinion that Ashton's blood gases indicating metabolic acidosis and organ dysfunction were a result of "complete deprivation of oxygen for a period of time[.]" Dr. Heygi opined that Ashton's condition was "most likely" caused by suffocation as a result of his mother laying over him and not realizing it. He explained that Ashton's injuries were "consistent with the mother rolling over the baby, the baby being asphyxiated, having . . . metabolic acidosis and not dying." Hegyi explained that he reached the conclusion that Ashton's injuries were "most likely" caused by his mother lying on top of him by ruling out alternative explanations for Ashton's injuries, such as sepsis, bloodborne infection, seizure disorder and aneurysm. Dr. Heygi explained that he tried "to figure out, is there anything else that could have done this to the baby? The answer is no." Dr. Hegyi later stated that his opinions of causation were "given to a reasonable degree of medical certainty."

Sampson also presented the testimony of Dr. Steven Shore, a board-certified pediatrician and Clinical Professor of Pediatrics at Emory University, on the issue of

6

causation. Dr. Shore testified that it was his opinion that Sampson's act of co-sleeping with Ashton is "more likely than not" what caused his ultimate diagnosis of HIE. Dr. Shore explained that, upon his review of witness accounts and Ashton's medical records from his "extensive" diagnostic work-up at CHOA, he ruled out any other potential cause or "co-factors" to explain Ashton's diagnosis. Dr. Shore explained that even co-sleepers who "prep" a sleep area to remove blankets and pillows cannot guard against suffocation risks because if an adult rolls over, she could disturb an infant's position so that he is no longer sleeping on his back or could move objects such that airway blockages occur. Dr. Shore testified that he did not believe that laryngeal issues and acid reflux factors caused Ashton's injuries because his x-ray imaging did not show aspiration in his lungs and there was no evidence that he vomited. While the defendants contend that Dr. Shore conceded that his causation opinion was speculative, a close review of his testimony shows otherwise. He clearly testified that co-sleeping was "more likely than not" the cause of Ashton's injuries, and he ruled out any other potential cause. While he did concede that there was no direct evidence of what happened while Sampson slept with her baby, that does not render his opinion speculative. While Ashton did not have any "trauma," such as bone or joint injuries, Dr. Shore explained that such evidence would not be expected in a

7

"passive rollover, I would think he would just suffocate." And even if the mother did not roll on top of Ashton, he could have been injured by the act of co-sleeping such as "re-breathing carbon dioxide from mom."

The defendants moved for summary judgment, in part, arguing that Sampson had not shown evidence indicating causation because there was no direct proof of what caused Ashton's injuries. In support of their motion, the defendants provided expert testimony from Dr. Steven Sobol, a pediatric otolaryngologist. Dr. Sobol deposed that it was "most likely" that Ashton's injuries were caused by a congenital issue with his airway. Dr. Sobol testified that he reached the conclusion that Ashton had an "unfortunate catastrophic respiratory event" arising from "predisposing factors, including his laryngomalacia" and that it was also likely Ashton had congenital subglottic stenosis because he was unable to be intubated easily.

The trial court granted summary judgment in favor of the defendants. The trial court held that Sampson failed "to provide any concrete evidence as to what occurred on the night that her son was injured, that the only evidence [she] has been able to provide is speculative testimony from her expert witnesses" and the "only witnesses that could tell us what happened are unable [to do so], as Ms. Sampson was asleep, and Ashton was a newborn child at the time." Sampson appeals, arguing that the trial

8

court erred by concluding that the testimony of her expert witnesses constituted nothing more than "speculation." .

In a medical malpractice case, "[a] mere showing of negligence without proof of causation is insufficient to withstand summary judgment." *Swint*, 340 Ga. App. at 482 (1). A "plaintiff must present expert medical testimony establishing that the defendant's negligence either proximately caused or contributed to his injuries." *Beasley*, 289 Ga. App. at 688. Causation must be "established through expert testimony because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the average lay person." (Citation omitted.) *Evans*, 359 Ga. App. at 800. " Using his or her specialized knowledge and training, the expert's role is to present a *realistic assessment of the likelihood* that the defendant's alleged negligence caused the plaintiff's injuries." (Emphasis in original.) *Beasley*, 289 Ga. App. at 688. However, Georgia law requires "only that an expert state an opinion regarding proximate causation in terms stronger than that of medical possibility, i. e., reasonable medical probability or reasonable medical certainty." (Citation omitted.) *Evans,* 359 Ga. App.

at 800.[2] Further, "causation may be established by linking the testimony of several different experts and must be determined in light of the evidentiary record as a whole. [I]t is well established that questions regarding causation are particularly questions for the jury except in clear, plain, palpable and undisputed cases." (Citation omitted). Id. at 800. See also *Moore v. Singh*, 326 Ga. App. 805, 809 (1) (755 SE2d 319) (2014).

In this case, the trial court applied an incorrect standard when it held that Sampson's experts were required to "give a definite conclusion as to what had occurred" based upon "concrete evidence." Rather, Georgia law "requires *only* that an expert state an opinion regarding proximate causation in terms stronger than that of medical possibility, i. e., reasonable medical probability or reasonable medical certainty," and such an expert must "express *some basis* for both the confidence for which his opinion is formed and the probability that his conclusion is accurate." (Citation and punctuation omitted; emphasis supplied.) *Zwiren v. Thompson*, 276 Ga.

---

[2] See *Beasley*, 289 Ga. App. at 688 ("The expert need not use the magic words 'reasonable degree of medical certainty,' but the facts in the record must be sufficient to meet the legal standard embodied in these 'magic words'") (footnotes omitted); *Zwiren v. Thompson*, 276 Ga. 498, 503 (578 SE2d 862) (2003) (causation experts in medical malpractice cases are not required to state their opinions to a "reasonable degree of medical *certainty*" since "reasonable medical *probability*" suffices) (emphasis supplied).

at 503. The expert can meet this requirement by "stating that the *only apparent cause* of the . . . injury was the defendant's action." (Citation omitted; emphasis in original.) *Swint*, 340 Ga. App. at 482 (1). And "[a]lthough an expert may lack direct evidence of the cause of [an injury], the expert may rely upon circumstantial evidence to support his theory." (Citation and punctuation omitted.) *Early v. Morgan Fleet Svcs., Inc.*, 368 Ga. App. 175, 178 (1) (888 SE2d 193) (2023). Even if an expert's opinion is based on circumstantial evidence, "this does not mandate the exclusion of his opinion but, rather, presents a jury question as to the weight which should be assigned to it." (Citation and punctuation omitted.) Id.[3]

Here, there was testimony from Sampson's experts that they believed, with reasonable medical certainty, that Ashton's injuries were caused by Sampson co-sleeping with him. They reached their conclusions by examining Ashton's medical records and test results from the initial emergency room visit and resulting hospital stay at CHOA and by ruling out other causes of the oxygen deprivation that

---

[3] We are not persuaded by the defendants' argument that Sampson's testimony that she did not roll onto her infant while she was asleep constitutes unimpeached direct evidence, such that circumstantial evidence cannot be relied upon. As the trial court's order aptly noted, there is no direct evidence regarding what happened on the night of Ashton's injuries because the "only witnesses that could tell us what happened are unable [to do so], as Ms. Sampson was asleep, and Ashton was a newborn child at the time."

11

contributed to his injuries. Both experts provided testimony regarding "the basis for which [their] conclusion[s were] formed, and the probability that [they are] accurate" by proving, through ruling out other possible causes of Ashton's injuries, that "the only apparent cause of the [infant's] injury" was co-sleeping with his mother. (Citation and punctuation omitted.) *Swint*, 340 Ga. App. at 483 (1). This methodology for the formulation of these opinions is sufficient under Georgia law. See *MyFamilyDoc, LLC v. Johnson*, 366 Ga. App. 459, 464 (2) (883 SE2d 404) (2023) (using a "differential diagnosis" methodology, "the physician considers all relevant causes of the patient's symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history") (citation and punctuation omitted); *Evans*, 359 Ga. App. at 801 (expert witness's opinion, stated to a reasonable degree of medical certainty, that nurse's breach of the standard of care led to a premature discharge which in turn led to patient's death created a genuine factual dispute on the issue of causation). Compare *Zwiren*, 276 Ga. at 401 ("Expert testimony that it was more likely that there was a possibility that the injury could have

been avoided does not provide the necessary basis for the expert's opinion on proximate cause") (punctuation omitted).[4]

The defendants' argument that Dr. Shore's testimony on causation is insufficient to survive summary judgment because it was "speculative" is without merit. When read in context, Dr. Shore's opinion that Ashton's injuries were "more likely than not" caused by co-sleeping with his mother resulted from his use of an acceptable methodology and was stated with an acceptable level of confidence as to the accuracy of his conclusion. His concession that "the 'exact cause' of the [injury] could not be determined with absolute certainty" in the absence of eyewitness testimony or video evidence is simply a recognition of the reality that his opinion is just that–an opinion based on all of the evidence available to him–and does not render the opinion speculative. "Absolute certainty" is not the standard for the admissibility of expert testimony, and where, as here, the qualified expert's opinion rests upon a reliable basis, it is admissible even where the expert candidly concedes it cannot be

---

[4] In addition to the evidence discussed above, there was testimony from Sampson herself that she did not have a crib or bassinet at home for Ashton and from Dr. Shore that Medicaid patients who were provided with a free bassinet from the hospital (as Sampson contends was required in this case) were dramatically less likely to co-sleep. This testimony provides further support for Sampson's claim that the co-sleeping that occurred in this case resulted from the defendants' alleged breaches of the standard of care.

stated with "absolute certainty." *Zwiren*, 276 Ga. at 503 (reasonable medical certainty *or* reasonable medical probability is the standard for the admissibility of causation opinions in medical malpractice cases where those opinions are given by qualified experts and based upon a reliable foundation); *Early*, 368 Ga. App. at 178 (1) ("absolute certainty" is not required for the admission of expert opinions, and when an expert lacked direct evidence of the cause of a fire, he was entitled to rely upon circumstantial evidence to support his opinion, with the jury being tasked with the job of deciding what weight to assign to that evidence).

Because the trial court's conclusion that the opinion testimony of these two experts was insufficient to survive summary judgment was based on an erroneous legal standard, we reverse. See *Early*, 368 Ga. App. at 178 (1) (reversing trial court's exclusion of an expert's opinion testimony regarding the cause of a bus fire as too speculative when the expert's testimony was based on circumstantial evidence and expert pointed to evidence and reliable methodology he utilized when reaching his conclusion).

*Judgment reversed. Barnes, P. J., and Rickman, J., concur*.