**FOURTH DIVISION**
**DILLARD, P. J.,**
**BROWN and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**August 21, 2024**

# In the Court of Appeals of Georgia

A24A0378. THE MEDICAL CENTER OF CENTRAL GEORGIA, INC. et al v. TURNER et al.

DILLARD, Presiding Judge.

Allen Turner died due to complications from a surgery to remove a polyp from his intestines. Following his death, his daughter—Norkesia Turner—sued Dr. William Thompson; Dr. Heather Nolan; and their employer, the Medical Center of Central Georgia, for medical malpractice and wrongful death.[1] The case then proceeded to trial, after which the jury rendered a verdict in Turner's favor, awarding her approximately $9,200,000 in damages—$7,200,000 of which were noneconomic

---

[1] Throughout the opinion, we refer to Allen Turner as "Allen," Norkesia Turner as "Turner," the Medical Center of Central Georgia as "MCCG," and Dr. William Thompson; Dr. Heather Nolan; and their employer, MCCG, collectively as "the appellants."

damages for wrongful death. In challenging the jury verdict and denial of several post-trial motions,[2] the appellants argue (1) the judgment should be reversed because Turner failed to present sufficient evidence of causation; and (2) the jury's award of $7,200,000 in noneconomic damages for wrongful death improperly exceeded the statutory limits on such damages in violation of OCGA § 51-13-1. For the following reasons, we affirm.[3]

---

[2] The trial court denied appellants' post-trial motions for a new trial, judgment notwithstanding the verdict, and to remit and amend the judgment.

[3] Oral argument was held on February 6, 2024, and is archived on the Court's website. *See* Court of Appeals of the State of Georgia, Oral Argument, Case No. A24A0378. (Feb. 6, 2022), *available at* https://vimeo.com/911637363. Shortly thereafter, this case was transferred to the Supreme Court of Georgia because it appeared to implicate that court's exclusive jurisdiction over constitutional questions. *See* Order in Case No. A24A0378 (Ga. App. Feb. 7, 2024). Our Supreme Court then returned the case to this Court based on its determination that "[e]ven assuming that [the] case raises a novel constitutional question, the trial court did not distinctly rule on any such question . . . ." *See* Order in Case No. S24A0664 (Ga. Mar. 27, 2024). Ordinarily, issues which "have not been ruled on by the trial court may not be raised on appeal." *Ga. Dep't of Nat. Res. v. Coweta Cnty.*, 261 Ga. 484, 485 (405 SE2d 470) (1991). But here, the trial court did not rule on a novel constitutional question because—as explained *infra* in Division 2—it found that, in *Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt*, 286 Ga. 731 (691 SE2d 218) (2010), the Supreme Court of Georgia had already ruled on the constitutional question at issue. And suffice it to say, we are bound by our Supreme Court's decisions. *See Whorton v. State*, 321 Ga. App. 335, 339 (1) (741 SE2d 653) (2013) (noting that "vertical stare decisis dictates that we faithfully adhere to the precedents established by the Supreme Court of Georgia").

Viewing the evidence in the light most favorable to the jury's verdict,[4] the record shows that in 2017, when he was 69 years old, Allen was referred to Dr. Thompson by another physician for surgery to excise a "polyp in the very distal duodenum." Prior to surgery, Allen underwent an endoscopy, a colonoscopy, and a "small [bowel] follow through series";[5] but neither a CT scan nor any other type of imaging was conducted on Allen. On March 31, 2017, Drs. Thompson and Nolan performed the operation, during which they unexpectedly discovered a cancerous mass approximately 25 percent larger than a golf ball. As a result, the doctors determined they needed to remove the mass, as well as the polyp. The area of operation, then, became "much larger" with "much higher risk." And according to Thompson, it was not an option to remove only the polyp and leave the cancerous mass to be excised in a subsequent procedure.

---

[4] *See Meadows v. Beam*, 302 Ga. 494, 495 (1) (807 SE2d 339) (2017) (viewing the evidence in an appeal from a jury verdict in the light most favorable to the prevailing party); *Preferred Women's Healthcare LLC v. Sain*, 367 Ga. App. 821, 822 (888 SE2d 599) (2023) ("On appeal following a jury trial, we view the evidence in the light most favorable to the jury's verdict.").

[5] A "small bowel follow through" involves taking a series of x-rays.

As they continued the operation, Drs. Thompson and Nolan also encountered a "large pulsing vessel near the aorta[,]" which was later determined to be the superior mesentery artery (the "SMA")—the primary vessel supplying blood to the intestines. But at the time, the surgeons did not believe the large blood vessel was the SMA because they were operating "far left" of where it is normally located. As it turned out, Allen's SMA was distorted and "in an abnormal place." Additionally, swelling in Allen's lymph nodes "affected [the surgeons'] ability to see things, which further complicated [the] surgery." And at some point during surgery, one of the doctors clamped the SMA on both sides and cut it in half.[6] After that, the "vascular team" aided the surgeons in attempting to repair Allen's SMA.

Ultimately, Drs. Thompson and Nolan were able to remove the polyp, the cancerous mass, associated lymph nodes, and everything they would need in order for the cancer to be evaluated. And while Allen survived the initial surgery, over the next few weeks, he underwent numerous additional surgeries due to the severance of his

---

[6] At the time of the surgery, Thompson was the surgeon of record and Nolan was a head resident. They worked together on the surgery, but it is unclear from the operative report which doctor cut the SMA.

4

SMA. Tragically, despite the additional surgeries, Allen died after suffering "multi-system failure."

Thereafter, Turner sued MCCG, Dr. Thompson, and Dr. Nolan, asserting claims of medical malpractice and wrongful death. Specifically, Turner alleged that Thompson and Nolan's negligence in treating Allen—which fell beneath their professional standard of care—caused and contributed to his injuries and death. Turner also claimed, *inter alia*, that a pre-surgery CT scan or MRI of Allen's abdomen would have revealed the cancerous mass and whether the SMA was in "the zone of their surgery." According to Turner, the proper standard of care required the doctors to identify and protect the SMA. And as required by law, Turner attached an affidavit from a medical expert, Dr. Marvin Evans, to her complaint in support of the allegations.[7]

---

[7] *See Jensen v. Yong Ha Engler*, 317 Ga. App. 879, 881 (1) (733 SE2d 52) (2012) ("[A] plaintiff is required to attach an OCGA § 9–11–9.1 expert affidavit to a complaint raising a claim for medical malpractice against a medical doctor. Absent compliance with the expert affidavit requirement, a medical malpractice claim is subject to dismissal for failure to state a claim." (citation omitted)); OCGA § 9–11–9.1 (a) ("In any action for damages alleging professional malpractice . . . the plaintiff shall be required to file with the complaint an affidavit of an expert competent to testify, which affidavit shall set forth specifically at least one negligent act or omission claimed to exist and the factual basis for each such claim."); OCGA § 9–11–9.1 (g) (11) ("[One of] [t]he professions to which this Code section shall apply [is] . . . [m]edical doctors

The appellants filed a joint answer to Turner's complaint, denying many of its allegations and asserting several affirmative defenses. Discovery then ensued, and the case ultimately proceeded to a jury trial. Following trial, the jury rendered a verdict in favor of Turner, awarding her (1) $618,853.59 for medical and funeral expenses; (2) $1,443,300 for Allen's pain and suffering; and (3) $7,216,500 in noneconomic damages for wrongful death. The trial court subsequently entered judgment on the verdict, adding $216.00 in favor of Turner for court costs. The appellants then filed a motion and amended motion for a new trial and judgment notwithstanding the verdict. They also filed a motion "to remit and amend the judgment," arguing that—as to her wrongful-death claim—the approximately $7,200,000 awarded for noneconomic damages exceeded the $350,000 cap on such damages in OCGA § 51-13-1. Following Turner's responses and a hearing on the motions, the trial court denied them all in separate orders. This appeal follows.

When a jury returns a verdict, it must be affirmed on appeal "if there is any evidence to support it, and the evidence is to be construed in a light most favorable to the prevailing party with every presumption and inference in favor of sustaining the

----

. . . .").

6

verdict."[8] Put another way, a jury verdict, "after approval by the trial court, and the judgment thereon will not be disturbed on appeal if supported by any evidence, in the absence of any material error of law."[9] And we review a denial of a motion for a new trial "according to this same standard."[10] With this deferential standard of review in mind, we turn to the appellants' specific claims of error.

---

[8] *Yash Sols., LLC v. New York Glob. Consultants Corp.*, 352 Ga. App. 127, 132 (1) (834 SE2d 126) (2019) (punctuation omitted); *accord Green v. Key Custom Homes*, Inc., 302 Ga. App. 800, 802 (1) (692 SE2d 56) (2010); *see Meadows*, 302 Ga. at 495 (1) (noting that "our review of a jury's verdict is for any evidence, and we lack the power to interfere with the jury's finding if it is supported by any evidence").

[9] *Yash Sols., LLC*, 352 Ga. App. at 132 (1) (punctuation omitted); *accord Green*, 302 Ga. App. at 802-3 (1); *see Greenway v. Sloan*, 211 Ga. 775, 776 (1) (88 SE2d 366) (1955) ("A verdict supported by any competent evidence which has the approval of the trial judge will not be disturbed by this court unless errors of law appear.").

[10] *Yash Sols., LLC*, 352 Ga. App. at 132 (1) (punctuation omitted); *accord Green*, 302 Ga. App. at 802 (1); *see Patterson-Fowlkes v. Chancey*, 291 Ga. 601, 602 (732 SE2d 252) (2012) ("In its review of the denial of a motion for judgment notwithstanding the verdict, this Court is to determine whether there is any evidence to support the jury's verdict. This same standard of appellate review is to be applied in the situation of the denial of . . . a motion for new trial on general grounds. In so doing, this Court must construe the evidence in a light most favorable to the prevailing party in the court below." (citations omitted)).

1. The appellants first argue the jury's verdict should be reversed because Turner failed to prove their allegedly negligent failure to perform a pre-surgery CT scan caused Allen's injuries and death. We disagree.

As our Supreme Court has explained, a person "professing to practice surgery or the administering of medicine for compensation must bring to the exercise of his profession a reasonable degree of care and skill."[11] Indeed, any injury resulting from "a want of such care and skill shall be a tort for which a recovery may be had."[12] Importantly, three essential elements to establish liability in a medical-malpractice action have emerged from OCGA § 51-1-27: "(1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure be the proximate cause of the injury sustained."[13]

---

[11] OCGA § 51-1-27; *accord Zwiren v. Thompson*, 276 Ga. 498, 499 (578 SE2d 862) (2003).

[12] OCGA § 51-1-27; *accord Zwiren*, 276 Ga. at 499.

[13] *Zwiren*, 276 Ga. at 499 (punctuation omitted); *accord Reeves v. Mahathre*, 328 Ga. App. 546, 548 (759 SE2d 926) (2014).

And because medical malpractice is a civil cause of action, a plaintiff "must prove liability (i.e., duty, negligence, proximate cause) by a preponderance of the evidence."[14] In this respect, the Supreme Court of Georgia has explained that "[p]roof by a preponderance simply requires that the evidence show that something is *more likely true than not*."[15] Similarly, many federal courts—including the Supreme Court of the United States and the Eleventh Circuit—have "explained that the burden of showing something by a 'preponderance of the evidence' simply requires the trier of fact to believe that the existence of a fact is *more probable* than its nonexistence."[16]

---

[14] *Zwiren*, 276 Ga. at 499 (punctuation omitted); *accord Knight v. Roberts*, 316 Ga. App. 599, 603-04 (1) (730 SE2d 78) (2012).

[15] *White v. State*, 307 Ga. 601, 607 (3) (b) (837 SE2d 838) (2020) (emphasis supplied); *see White v. Stanley*, 369 Ga. App. 330, 335 (1) (893 SE2d 466) (2023) (explaining that the Supreme Court of Georgia has provided a "straightforward[] and brief definition" of preponderance of the evidence, holding that it "simply requires that the evidence show that something is more likely true than not" (punctuation omitted)).

[16] *White*, 369 Ga. App. at 335 (1) (punctuation omitted) (emphasis supplied); *see Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cali.*, 508 U.S. 602, 622 (1)(a) (113 SCt 2264, 124 LEd2d 539) (1993); *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 (II) n.9 (117 SCt 1953, 138 LEd2d 327) (1997); *United States v. Almedina*, 686 F3d 1312, 1315 (III) (11th Cir. 2012); *United States v. Trainor*, 376 F3d 1325, 1331 (III) (A) (11th Cir. 2004).

Additionally, we have held that to recover in a medical-malpractice case based on wrongful death, a plaintiff "must show not only a violation of the applicable medical standard of care but also that the purported violation or deviation from the proper standard of care is the proximate cause of the injury sustained."[17] And significantly, to satisfy this burden, the plaintiff must "use expert testimony because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the average

---

[17] *Pneumo Abex, LLC v. Long*, 357 Ga. App 17, 18, 21 (1) (a) (849 SE2d 746) (2020) (punctuation omitted); *accord Knight*, 316 Ga. App. at 603 (1); *see Zwiren*, 276 Ga. at 500 ("It is clear that a plaintiff cannot recover for medical malpractice, even where there is evidence of negligence, unless the plaintiff establishes by a preponderance of the evidence that the negligence "either proximately caused or contributed to cause plaintiff harm." (punctuation omitted)); *Pruette v. Phoebe Putney Mem'l Hosp.*, 295 Ga. App. 335, 338 (1) (671 SE2d 844) (2008) (acknowledging that an action for wrongful death can be the basis for a medical-malpractice claim).

layperson."[18] But questions regarding causation are "peculiarly questions for the jury except in clear, plain, palpable and undisputed cases."[19]

Particularly relevant here, in Georgia, medical causation must "be proved to a reasonable degree of medical certainty and cannot be based on mere speculation, and the evidence must provide more than a mere or bare possibility that the alleged negligence caused the plaintiff's injury."[20] So, the expert's testimony "must show as an evidentiary threshold that [his or her] opinion regarding causation is based, at the

---

[18] *Pneumo Abex*, *LLC*, 357 Ga. App. at 21 (1) (a) (punctuation omitted); *see Zwiren*, 276 Ga. at 499 ("In order to establish proximate cause by a preponderance of the evidence in a medical malpractice action, the plaintiff must use expert testimony because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the average layperson.").

[19] *Adams v. Piedmont Henry Hosp., Inc.*, 365 Ga. App. 257, 266 (1) (878 SE2d 113) (2022) (punctuation omitted); *accord Pneumo Abex*, *LLC*, 357 Ga. App. at 21 (1) (a); *see Atlanta Obstetrics & Gynecology Grp., P.A. v. Coleman*, 260 Ga. 569, 570 (398 SE2d 16) (1990) ("[P]roximate cause must be determined by a jury except in plain and undisputed cases." (punctuation omitted)).

[20] *Pneumo Abex*, *LLC*, 357 Ga. App. at 22 (1) (a) (punctuation and footnote omitted); *see Zwiren*, 276 Ga. at 503 ("Georgia case law requires only that an expert state an opinion regarding proximate causation in terms stronger than that of medical possibility, *i.e.*, reasonable medical probability or reasonable medical certainty."); *Walker v. Giles*, 276 Ga. App. 632, 638 (1) (624 SE2d 191) (2005) ("Medical causation must be proved to a reasonable degree of medical certainty and cannot be based on mere speculation." (punctuation omitted)).

least, on the determination that there was a reasonable probability that the negligence caused the injury."[21] But a reasonable degree of medical certainty, "while an acceptable means by which an expert may express the confidence he or she has in the conclusion formed and the probability that it is accurate, is *not the required standard*."[22] To the contrary, Georgia law requires only that "an expert state an opinion regarding proximate causation in terms stronger than that of medical possibility, *i.e.*, *reasonable medical probability* or reasonable medical certainty."[23]

Put another way, in providing an opinion in a medical-malpractice case, an expert "need not use the magic words reasonable degree of medical certainty, but the facts in the record must be sufficient to meet the legal standard embodied in those

---

[21] *Pneumo Abex*, *LLC*, 357 Ga. App. at 22 (1) (a) (punctuation omitted); *see Zwiren*, 276 Ga. at 499 (explaining, in a medical malpractice case, that the "expert's testimony must show as an evidentiary threshold that the expert's opinion regarding causation is based, at the least, on the determination that there was a reasonable probability that the negligence caused the injury" (punctuation omitted)).

[22] *Pneumo Abex*, *LLC*, 357 Ga. App. at 22 (1) (a) (punctuation omitted) (emphasis supplied); *accord Zwiren*, 276 Ga. at 503.

[23] *Pneumo Abex*, *LLC*, 357 Ga. App. at 22 (1) (a) (punctuation omitted) (emphasis supplied); *accord Zwiren*, 276 Ga. at 503.

'magic words.'"[24] Indeed, in presenting an opinion on causation, the expert is "required to express some basis for both the confidence with which his conclusion is formed, and the probability that his conclusion is accurate."[25] There must be, then, a "realistic assessment of the likelihood that the alleged negligence caused the injury or death."[26] And as we have previously explained, "perhaps nothing in medicine is absolutely certain, but the law intends that if the plaintiff's medical expert cannot form an opinion with sufficient certainty so as to make a medical judgment, there is nothing

---

[24] *Pneumo Abex*, *LLC*, 357 Ga. App. at 24 (1) (a) (punctuation omitted); *see Jackson v. Gershon*, 251 Ga. 577, 579 (308 SE2d 164) (1983) ("Magic words alone, no matter how often repeated, do not make a fact. Rather the facts in the record must be sufficient to meet the legal standard embodied in the magic words. It is asking too much of an expert witness to expect him to state point-blank about a professional colleague, 'He was negligent.'"); *Anthony v. Chambless*, 231 Ga. App. 657, 659 (1) (500 SE2d 402) (1998) ("Although it is not necessary for the plaintiff's experts to use the magic words 'reasonable degree of medical certainty' in describing the decedent's prospect of survival with appropriate treatment, such prospect must be more than a mere chance or speculation." (punctuation omitted)).

[25] *Pneumo Abex*, *LLC*, 357 Ga. App. at 24 (1) (a) (punctuation omitted); *accord Zwiren*, 276 Ga. at 501.

[26] *Pneumo Abex*, *LLC*, 357 Ga. App. at 24 (1) (a) (punctuation omitted); *see Zwiren*, 276 Ga. at 501 ("In presenting an opinion on causation, the expert is required to express some basis for both the confidence with which his conclusion is formed, and the probability that his conclusion is accurate." (punctuation omitted)).

on the record with which a jury can make a decision with sufficient certainty so as to make a legal judgment."[27]

Turning to the instant case, the appellants argue Turner failed to present sufficient evidence that the surgeons' failure to conduct a pre-surgery CT scan caused the doctors to sever Allen's SMA, which resulted in his death. This claim is belied by the record.

As an initial matter, Turner's expert—Dr. Evans—testified that Allen "died as a result of the division of the [SMA] and all of the consequences that occurred after that." And the appellants' expert, Dr. George Fuhrman, agreed that "the fact that the SMA was severed and the lack of blood flow to the bowel [that] occurred . . . was what ultimately led to [Allen's] death . . . ." Evans also testified that it is outside the applicable standard of care to cut and divide a blood vessel without identifying it. So, it is undisputed that severance of Allen's SMA during surgery caused his death.

Nevertheless, the issue before us is whether it is more likely than not that Drs. Thompson and Nolan's *failure to conduct a CT scan* prior to surgery would have revealed the unusual location of the SMA, so the doctors could have avoided cutting

---

[27] *Pneumo Abex*, *LLC*, 357 Ga. App. at 24 (1) (a) (punctuation omitted); *accord Zwiren*, 276 Ga. at 501.

it. In this regard, Dr. Evans testified that, in his professional opinion, "[h]ad one done a CT scan with the proper technique looking at blood vessels, then you would be able to see the [SMA] in its course[ ] and whether it's distorted or not, you would know that by use of a [CT] scan." Further, when asked whether he could say "within a reasonable *medical probability*" that a CT scan would likely have prevented the SMA from being cut in two, Evans testified that, even though it cannot be guarantied, the chance of it happening would be "a *lot less.*"[28] In other words, Evans testified that if a CT scan or any other imaging scan such as an MRI had been performed, "you would have know[n] that the anatomy is distorted and . . . you could avoid the trap of cutting the blood vessel." Given the foregoing, Evans's expert testimony provided ample evidence to establish that there was more than a "mere possibility" that Thompson and Nolan's failure to order a pre-surgery CT scan resulted in the severance of Allen's SMA, which caused his death. Indeed, Evans testified there was a medical probability it did cause Allen's death, which is certainly enough here.[29]

---

[28] (Emphasis supplied).

[29] *See Zwiren*, 276 Ga. at 503 (explaining that, in a medical malpractice case, Georgia caselaw "requires only that an expert state an opinion regarding proximate causation in terms stronger than that of medical possibility, i.e., reasonable *medical probability or* reasonable medical certainty" (emphasis supplied)); *Evans v. Med. Ctr.*

Importantly, Turner was not required to present expert testimony that the expert was absolutely certain a CT scan would have prevented the doctors from severing Allen's SMA.[30] As a result, to the extent there was conflicting testimony "regarding causation, it is the province of the jury to decide which testimony is most believable."[31] And here, the jury evidently believed Dr. Evans's testimony that a pre-surgery CT scan would *likely—i.e.*, more likely than not—have prevented the doctors

*of Cent. Ga.*, 359 Ga. App. 797, 800 (860 SE2d 100) (2021) (same); *Knight v. Roberts*, 316 Ga. App. 599, 604 (1) (a) (730 SE2d 78) (2012) (same). And while appellants only challenge whether there was sufficient evidence to establish causation, Dr. Evans also testified that it was "outside the standard of care to cut and divide the vessel without knowing what it is." He also testified that the failure to identify the location of the SMA was outside the standard of care whether it was in its normal location or pulled to the side because it is such a "critical vessel" and "must be saved to save the patient."

[30] *See Zwiren*, 276 Ga. at 501 ("[P]erhaps *nothing in medicine is absolutely certain*, but the law intends that if the plaintiff's medical expert cannot form an opinion with sufficient certainty so as to make a medical judgment, there is nothing on the record with which a jury can make a decision with sufficient certainty so as to make a legal judgment." (punctuation omitted) (emphasis supplied); *Pneumo Abex*, *LLC*, 357 Ga. App. at 24 (1) (a)(same).

[31] *Mekoya*, 360 Ga. App. at 462 (2); *see Brooks v. Cellin Mfg. Co.*, 251 Ga. 395, 398 (306 SE2d 657) (1983) (noting that when experts offer conflicting testimony, it is the province of the jury to decide which testimony is more believable); *Fireman's Fund Ins. Co. v. Holder Constr. Grp., LLC*, 362 Ga. App. 367, 373 (1) (a) (868 SE2d 485) (2022) ("In the face of conflicting expert testimony, it [i]s the province of the jury to decide which expert, if either, to credit." (punctuation omitted)).

from severing Allen's SMA. Under such circumstances, Turner presented sufficient evidence to prove causation by a preponderance of the evidence.[32]

2. Next, the appellants argue the jury's award of approximately $7,200,000 for noneconomic damages as to the wrongful-death claim must be remitted and amended because it exceeded the $350,000 cap on noneconomic damages imposed by OCGA § 51-13-1. But this argument is foreclosed by binding Supreme Court of Georgia precedent.[33]

---

[32] *See Coleman*, 260 Ga. at 570-71 (holding that, as to causation, there was evidence to support the jury's verdict in favor of the plaintiff in a medical-malpractice case when evidence showed that the doctor's negligent administration of a hormone shot resulted in the patient needing an abortion); *Moore v. Singh*, 326 Ga. App. 805, 810 (1) (755 SE2d 319) (2014) (holding that the trial court erred by granting a motion for a directed verdict in a medical-malpractice case when there was testimony by medical experts that the doctor breached the standard of care, resulting in a missed diagnoses, which required surgery); *Knight*, 16 Ga. App. at 608 (1) (b) (holding plaintiff presented sufficient evidence of causation in a medical-malpractice case when expert testified, *inter alia*, doctor's failure to timely diagnose the patient was a contributing cause leading to her ultimate death).

[33] We thank the Georgia Hospital Association, Inc. and the Medical Association of Georgia for their thoughtful amicus brief.

The jury rendered a verdict in Turner's favor, awarding her, in relevant part, $7,216,500 in noneconomic damages for her wrongful-death claim only.[34] Thereafter, appellants filed a motion "to remit and amend the judgment," arguing these noneconomic damages improperly exceeded the $350,000 limit on such damages under OCGA § 51-13-1. And in denying the motion, the trial court ruled that, in *Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt*,[35] our Supreme Court held the caps on noneconomic damages in OCGA § 51-13-1 violated the constitutional right to a jury trial.[36] Further, the *Nestlehutt* Court noted that "[t]he general rule is that an

---

[34] The damages awarded for Turner's medical-malpractice claim were solely economic, and those are not at issue in this appeal.

[35] 286 Ga. 731 (691 SE2d 218) (2010).

[36] *See* Ga. Const. Art. I, Sec. I, Para. XI(a) (providing that the right to a jury trial "shall remain inviolate"); U.S. Const. amend. VII ("In [s]uits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."); *see also Melson v. Dickson*, 63 Ga. 682, *686 (1) (1879 WL 2629) (1879) (holding that "an impartial jury is the corner-stone of the fairness of trial by jury"); *Jones v. Cloud*, 119 Ga. App. 697, 706 (5) (168 SE2d 598) (1969) (same); *Sec. & Exch. Comm'n v. Jarkesy*, ___ U. S. ___ (II) ((144 SCt 2117, 2128) (2024) (noting that "[t]he right to trial by jury is 'of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right' has always been and 'should be scrutinized with the utmost care'") (citation omitted)); Morris S. Arnold, *A Historical Inquiry into the Right to Trial by Jury in Complex Civil Litigation, in The Bill of Rights: Original Meaning*

unconstitutional statute is wholly void and of no force and effect from the date it was enacted[,]"[37] and as to OCGA § 51-13-1, it found no reason to deviate from this general rule.[38]

Relevant here, OCGA § 51-13-1 provides as follows:

In any verdict returned or judgment entered in a medical malpractice action, *including an action for wrongful death*, against one or more health care providers, the total amount recoverable by a claimant for noneconomic damages in such action shall be limited to an amount not to exceed $350,000.00, regardless of the number of defendant health care providers against whom the claim is asserted or the number of separate causes of action on which the claim is based.[39]

And in *Nestlehutt*, the Supreme Court of Georgia unambiguously held—without any qualifications or exceptions—that "the noneconomic damages caps in OCGA §

---

*and Current Understanding* 399, 400 (Eugene W. Hickok, Jr. ed., 1993) ("That special affection for the jury ought to be viewed as relevant not just to the fact that jury trial was 'preserved' in the Constitution; it is relevant as well to interpreting the scope of the actual provision, for it gives the right granted an aura and the Constitution a meaning they would not otherwise have if the institution of jury trial had been regarded more or less indifferently.").

[37] *Nestlehutt*, 286 Ga. at 738 (3) (punctuation omitted).

[38] *See id.* at 738 (2)-(3).

[39] OCGA § 51-13-1 (b) (emphasis supplied).

51–13–1 violate the right to a jury trial as guaranteed under the Georgia Constitution."[40] Those caps expressly include wrongful-death claims *in the context of a medical-malpractice action.*[41]

Nevertheless, appellants argue the $350,000 cap on noneconomic damages in OCGA § 51-13-1 applies to Turner's wrongful-death claim because *Nestlehutt* involved only a medical-malpractice claim. Specifically, they contend the *Nestlehutt* Court would not have ruled that statutory caps on noneconomic damages in wrongful-death cases are unconstitutional because that issue was not before it. But in our view, appellants read *Nestlehutt* far too narrowly.

As the Supreme Court of Georgia has explained, Georgia's constitutional jury trial right "protects only those *rights* to a jury trial that existed in Georgia in 1798 [the

---

[40] *Nestlehutt*, 286 Ga. at 731 (emphasis supplied); *see supra* n. 36. In a footnote, our Supreme Court clarified that it expressed "no opinion as to subsection (f) of OCGA § 51–13–1, which provides for periodic payment of future damages awards of $350,000 or more in medical malpractice actions." *Nestlehutt*, 286 Ga. at 731 (1) n.1. But the allowance for periodic payments of damages in OCGA § 51-13-1 (f) is irrelevant to the *Nestlehutt* Court's express holding that *all of the caps* on damages delineated in other sections of the statute are unconstitutional.

[41] *See* OCGA § 51-13-1 (providing for a $350,000 cap on noneconomic damages in "any verdict returned or judgment entered in a medical malpractice action, *including an action for wrongful death . . .*" (emphasis supplied)).

time at which our state adopted the Constitution of 1798]."[42] And although *Nestlehutt* did not involve a claim specifically characterized as one for wrongful death, our Supreme Court described the legal *right* available in 1798 as claims *involving* the negligence of a health care provider.[43] Suffice it to say, the wrongful-death claim in *this* case *involves* negligence by a health care provider.[44] And again, the *Nestlehutt* Court expressly ruled the damages caps in OCGA § 51-13-1 are unconstitutional as applied to medical malpractice, which—by the explicit terms of the statute—*includes wrongful death*.[45] Significantly, our Supreme Court did *not* exclude wrongful-death claims

---

[42] *Taylor v. Devereux Found., Inc.*, 316 Ga. 44, 58 (III) (A) (885 SE2d 671) (2023) (emphasis supplied); *see Nestlehutt*, 286 Ga. at 734 (2) (a) ("Given the clear existence of medical negligence claims as of the adoption of the Georgia Constitution of 1798, we have no difficulty concluding that such claims are encompassed within the right to jury trial under Art. I, Sec. I, Par. XI (a)").

[43] *See Nestlehutt*, 286 Ga. at 734 (2) (a) ("[A]t the time of the adoption of our Constitution of 1798, there did exist the common law right to a jury trial for claims *involving the negligence of a health care provider*, with an attendant right to the award of the full measure of damages, including noneconomic damages, as determined by the jury." (emphasis supplied)).

[44] *See Taylor*, 316 Ga. at 59 (III) (B) ("[T]he claim that was restricted by the statute—a claim for non-economic damages in a tort case *involving* medical negligence—was within the scope of the constitutional right to trial by jury in Georgia." (emphasis supplied)).

[45] *See supra* note 41.

21

*involving medical malpractice* in finding this aspect of the statute unconstitutional. Simply put, setting aside wrongful-death claims unrelated to medical malpractice,[46] the *Nestlehutt* Court held that causes of action *involving* medical malpractice existed in 1798, and as a result, the caps on noneconomic damages in OCGA § 51-13-1 are unconstitutional. And here, Turner's wrongful-death claim unquestionably involves medical malpractice, so the statutory cap on damages as to that claim violates her *inviolate* right to a jury trial under the Georgia Constitution.[47]

---

[46] We express no opinion as to whether a statute capping damages on a wrongful-death claim unrelated to medical malpractice would be constitutional, as that is a novel question for our Supreme Court to answer. *See* Ga. Const. art. VI, § 6, ¶ II (1) ("The Supreme Court shall be a court of review and shall exercise exclusive appellate jurisdiction in . . . [a]ll cases involving the construction of a treaty or of the Constitution of the State of Georgia or of the United States and all cases in which the constitutionality of a law, ordinance, or constitutional provision has been drawn in question."); *but see State v. Davis*, 303 Ga. 684, 687-88 (1) (814 SE2d 701) (2018) ("The Court of Appeals has limited jurisdiction [in cases such as this] . . . over cases that involve the application, in a general sense, of *unquestioned and unambiguous provisions of the Constitution* to a given state of facts and that do not involve construction of some constitutional provision directly in question and doubtful either under its own terms or under the decisions of the Supreme Court of Georgia or the Supreme Court of the United States." (emphasis supplied)).

[47] The Supreme Court of Georgia in *Nestlehutt* made two unqualified statements that *all* of the caps on damages in OCGA § 51-13-1 are unconstitutional. Specifically, at the outset of the opinion, the Supreme Court noted that "[b]ased on [its] view of the record and the applicable law, . . . the noneconomic damages caps in OCGA § 51–13–1 violate the constitutional right to trial by jury . . . ." *Nestlehutt*, 286 Ga. at 731. And

For all these reasons, we affirm the jury's verdict in favor of Turner.

*Judgment affirmed. Brown and Padgett, JJ., concur.*

---

later in the opinion, the Court reiterated that it "conclude[d] that the noneconomic damages caps in OCGA § 51–13–1 violate the right to a jury trial as guaranteed under the Georgia Constitution."*Nestlehutt*, 286 Ga. at 738 (2) (b). Given that OCGA § 51-13-1 includes wrongful death as a *type* of medical-malpractice claim, and the Supreme Court in *Nestlehutt* did not exclude such claims from its holding, we are bound to conclude that—like the cap on damages in medical-malpractice cases delineated in OCGA § 51-13-1—the cap on wrongful-death claims asserted in such cases are likewise unconstitutional. *See* Ga. Const. of 1983, Art. VI, Sec. VI, Par. VI ("The decisions of the Supreme Court shall bind all other courts as precedents."); *State v. Smith*, 308 Ga. App. 345, 352 (707 SE2d 560 (2011) ("[T]he doctrine of stare decisis prohibits this Court from ignoring the valid precedent of a higher court."); *State v. Jackson*, 287 Ga. 646, 658 (5) (697 SE2d 757) (2010) ("Stare decisis is an important principle that promotes the rule of law . . . ."); *see also* Kurt T. Lash, *Originalism, Popular Sovereignty, and Reverse Stare Decisis*, 93 Va. L. Rev. 1437, 1454 (2007) (noting that "[v]ertical stare decisis refers to the binding effect of precedent on lower courts," and that "[s]erious rule of law costs would follow if lower courts were free to ignore precedent established by a higher court of appeal").